Sealed                                    ATTACHMENT A (UNDER SEAL)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18-CR-20685-WILLIAMS

FILED BY_____D.C.

JUN 21 2019

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

UNITED STATES OF AMERICA

v.

FRANCISCO CONVIT GURUCEAGA, et al.,

Defendants.

Filed *Ex Parte* and UNDER SEAL

**DECLARATION OF HSI SPECIAL AGENT ALAN G. VEGA
IN SUPPORT OF SECOND PROTECTIVE ORDER**

I, ALAN G. VEGA, under penalty of perjury, declare:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this declaration in support of an *ex parte* application for the entry of a second protective order for an asset subject to forfeiture in the above-captioned case. I am a Special Agent with Homeland Security Investigations ("HSI"), performing the duties provided by law and regulation, and empowered to conduct investigations of offenses against the United States. I have been employed by HSI for the last 16 years. I am currently responsible for conducting and assisting in investigations relating to money laundering, wire fraud, and other federal crimes. I am currently assigned to the HSI Miami Illicit Proceeds and Foreign Corruption Group. I have been assigned to this group for approximately six years. In my current role, I participate in investigations concerning the concealment and laundering of illicitly derived funds by Politically Exposed Persons ("PEPs") and/or Transnational Criminal Organizations ("TCOs").

2. The facts in this declaration come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This declaration is

ATTACHMENT A (UNDER SEAL)

intended to show simply that there is sufficient probable cause for the requested second protective order and does not set forth all of my knowledge about this matter.

## ASSET SUBJECT TO FORFEITURE

3. This declaration sets forth facts establishing that there is probable cause to believe that M/Y Blue Ice, which is more fully described as a 1999 135-foot Baglietto yacht, official number 40146 registered in St. Vincent and the Grenadines, is subject to forfeiture based on the offenses alleged in the Indictment, pursuant to 18 U.S.C. § 982(a)(1), as property involved in a money laundering in violation of 18 U.S.C. § 1956, property traceable to such property, and/or, pursuant to 18 U.S.C. § 981(a)(1)(C), as property that constitutes or is derived from the proceeds of a violation of 18 U.S.C. § 1952.

## STATEMENT OF FACTS

4. Defendants Gustavo Adolfo Hernandez Frieri ("Defendant Hernandez Frieri"), Abraham Edgardo Ortega ("Defendant Ortega"), Francisco Convit Guruceaga ("Defendant Convit"), Marcelo Federico Gutierrez Acosta y Lara, Jose Vincente Amparan Croquer, a.k.a. "Chente" ("Defendant Amparan"), Carmelo Antonio Urdaneta Aqui ("Defendant Urdaneta"), Mario Enrique Bonilla Vallera, and Hugo Andre Ramalho Gois, as well as Matthias Krull ("Defendant Krull"),[1] (collectively, the "Defendants") laundered, through financial accounts in the Southern District of Florida and elsewhere, illicit proceeds derived from bribery and embezzlement schemes at the Venezuelan state-owned oil company, Petróleos de Venezuela, S.A. ("PDVSA").

---

[1] Defendant Krull was initially charged by Criminal Complaint in the above-captioned case, and since been sentenced in a related criminal case, *United States v. Krull*, Case No. 18-20682-CR-ALTONAGA (S.D. Fla.).

2

ATTACHMENT A (UNDER SEAL)

A. **PDVSA Corruption**

*1. Background*

5.  As set forth in greater detail in the affidavit supporting the Criminal Complaint [ECF No. 3], at all relevant times, Venezuela had a foreign-currency exchange system under which the government would exchange local currency (bolivars) at a fixed rate for U.S. dollars. The fixed exchange rate had been well below the true economic rate by a substantial factor for several years. For example, in 2014, an individual could exchange $10 million for 600 million bolivars at the true economic rate. If that individual also had access to the government fixed exchange rate, the individual could convert the same 600 million bolivars into $100 million. Essentially, in two transactions, that person could buy $100 million for $10 million.

6.  The difference between the fixed rate and the true economic rate created opportunity for fraud and abuse, enabling Venezuelan officials to engage in foreign currency exchange schemes in return for bribes and kickbacks.

7.  PDVSA was Venezuela's primary source of income and foreign currency (namely, U.S. dollars and Euros), and consequently, it funded many of the corrupt foreign exchange schemes.

*2. Eaton-Rantor Loan Scheme*

8.  In or around December 2014, PDVSA and Rantor Capital C.A. ("Rantor"), a Venezuelan shell company, entered into a "loan" contract, which Rantor later assigned to Eaton Global Services Limited ("Eaton"), a Hong Kong company. Under the following agreements, Eaton would receive approximately €511 million from PDVSA after only "loaning" PDVSA approximately 7.2 billion bolivars, the market equivalent of approximately €35 million (hereinafter referred to as the "Eaton-Rantor Loan Scheme"):

3

   (i) In a <u>loan contract</u> dated on or about December 17, 2014, Rantor agreed to "loan" 7.2 billion bolivars to PDVSA. The "loan" contract was executed by Venezuelan Official 1 as a Vice President of PDVSA. Venezuelan Official 1 was a "foreign official" as defined in the Foreign Corrupt Practices Act ("FCPA").

   (ii) In an <u>assignment contract</u> dated on or about December 23, 2014, Rantor assigned its rights as PDVSA's creditor under the "loan" contract to Eaton, and PDVSA was given the right to cancel the debt within 180 days by paying $600 million.

   (iii) In a <u>notice of assignment letter</u> dated on or about December 23, 2014, Eaton sent a notice of the assignment to PDVSA (*i.e.*, Venezuelan Official 1), and suggested that PDVSA repay the 7.2-billion bolivar loan in the Euro equivalent of $600 million. The letter included instructions for PDVSA to wire the funds to Portmann Capital accounts for the benefit of Eaton.

9. Based on an attachment to a September 2015 e-mail circulated among Defendant Amparan and other conspirators, and as corroborated by recorded conversations, the division of proceeds from the Eaton-Rantor Loan Scheme was as follows:

   a. Approximately €227 million went to the "Bolichicos" or "Boli" (Defendant Convit and Conspirator 2); and

   b. Approximately €227 million Euros went to Conspirator 7.

10. The proceeds were further distributed as follows:

   c. The "Bolichicos" routed approximately €78 million of their €227 million to a confidential source ("CS") for further payment to others; and

d.  Conspirator 7 routed approximately €159 million to individuals known as "Los Chamos," the stepsons of "Venezuelan Official 2," who was a "foreign official" as that term is defined in the FCPA.

### 3. *Acquisition of M/Y Blue Ice*

11.  In accordance with the notice of assignment letter, and based on financial records of Portmann Capital, between on or about December 29, 2014, and on or about February 2, 2015, PDVSA sent a total of approximately 385,216,708.87 Euros via seven wire transfers to Portmann Capital accounts for the benefit of Eaton, a company owned and controlled by Conspirator 7. These Euros were subsequently exchanged for U.S. dollars, and approximately $45 million of the funds initially for the benefit of Eaton were transferred to Andiron Corp SA ("Andiron"), another company owned and controlled by Conspirator 7.

12.  According to Portmann Capital and Bank of America records, between on or about September 29, and on or about December 4, 2015, more than $3 million traceable to the Eaton-Rantor Loan Scheme proceeds was transferred from Portman Capital accounts to Interglobal Yacht Sales LLC ("Interglobal") in the following wires:

  i.  On or about September 29, 2015, approximately $541,614 was transferred from Portmann Capital to an account at Bank of America held by Interglobal, with the wire transfer details stating "INV GP 1415 + DEPOSIT."

  ii.  On or about December 1, 2015, approximately $1,000,000 was transferred from Portmann Capital to an account at Bank of America held by Interglobal, with the wire transfer details stating "CONTRACT DD 10/09/2015."

5

       iii. On or about December 8, 2015, approximately $1,500,000 was transferred to the same account at Bank of America held by Interglobal, with wire transfer details stating "CONTRACT DD 09/10/2015."

13. Then, in or around December 2015, a total of approximately $3,132,000.00 was transferred or withdrawn from Interglobal in five transactions for the purchase of M/Y Blue Ice. The details for each of these transactions referenced "135 BAGLIETTO" or payments for "BAGLIETTO BLUE ICE."

14. The aforementioned transactions are summarized and depicted in the flow chart attached as Exhibit 1.

15. According to the State of Florida, Division of Corporation's website, Interglobal is a Florida limited liability company located in Miami, Florida. Law enforcement agents interviewed the managing member of Interglobal, and obtained financial records confirming that the above-referenced transfers.

16. Interglobal's managing member confirmed he was the yacht broker that acquired the M/Y Blue Ice for Conspirator 9, who is the brother-in-law of Conspirator 7. He also confirmed that the two transfers on or about December 1 and 8, 2015, from Portmann Capital to Interglobal's Bank of America account funded the purchase of M/Y Blue Ice.

## CONCLUSION

17. Funds traceable to the proceeds from Eaton-Rantor Loan Scheme were used to acquire M/Y Blue Ice. Based on the foregoing, there is probable cause to believe that the M/Y Blue Ice is subject to forfeiture, pursuant to 18 U.S.C. § 982(a)(1), as property involved in a violation of 18 U.S.C. § 1956 alleged in the Indictment, as property traceable to such property,

and/or, pursuant to 18 U.S.C. § 981(a)(1)(C), as property that constitutes or is derived from the proceeds of a violation of 18 U.S.C. § 1952 alleged in the Indictment.

Executed on June __20__, 2019.

Respectfully submitted,

_____
Alan G. Vega, Special Agent
HOMELAND SECURITY INVESTIGATIONS

## BLUE ICE YACHT PURCHASE TRACING

**Agreement Date:** SEPTEMBER 10, 2015
**Buyer:** EATON GLOBAL SERVICES / ANDIRON CORP SA
**Seller:** VENUS CORPORATION LTD
**Listing Broker:** FRASER WORLDWIDE
**Purchase Price:** $3,600,000.00

*According to Purchase Agreements provided to the bank in support of the wires to INTERGLOBAL.

**PETRÓLEOS DE VENEZUELA, S.A. (PDVSA)**

| Date | Amount |
|---|---|
| 12/29/2014: | €41,064,388.96 |
| 12/30/2014: | €41,064,388.96 |
| 01/05/2015: | €41,138,719.76 |
| 01/15/2015: | €42,498,937.53 |
| 01/20/2015: | €43,058,904.58 |
| 01/30/2015: | €87,966,220.97 |
| 02/02/2015: | €88,425,148.11 |
| **TOTAL:** | **€385,216,708.87** |

↓

**PORTMANN CAPITAL (CLIENT: EATON GLOBAL)**

| Date | Amount |
|---|---|
| 03/18/2015: | $25,000,000.00 |
| 03/24/2015: | $20,000,000.00 |
| **TOTAL:** | **$45,000,000.00** |

12/01/2015: **$1,000,000.00** "CONTRACT DD 10/09/2015"

↓

**[redacted entity]**

| Date | Amount |
|---|---|
| 09/29/2015: | $541,614.00 – "INV GP 1415 + DEPOSIT" |
| 12/08/2015: | $1,500,000.00 – "CONTRACT DD 09/10/2015" |
| **TOTAL:** | **$2,041,614.00** [$1,860,000.00 for BLUE ICE] |

↓

**INTERGLOBAL YACHT SALES LLC**
BANK OF AMERICA

| Date | Amount |
|---|---|
| 12/04/2015: | $132,000.00 – "BROKERS COMMISSIONS 135 BAGLIETTO" |
| 12/04/2015: | $700,000.00 – "PARTIAL PAYMENT FOR BAGLIETTO 135" |
| 12/08/2015: | $1,500,000.00 – "PARTIAL PAYMENT BAGLIETTO BLUE ICE" |
| 12/09/2015: | $200,000.00 – "PARTIAL PAYMENT BAGLIETTO BLUE ICE" |
| 12/10/2015: | $600,000.00 – "FINAL PAYMENT OF 1999 BAGLIETTO 135" |
| **TOTAL:** | **$3,132,000.00** |

↓

**FRASER WORLDWIDE SAM**
BNP PARIBAS

**EXHIBIT 1**