**EXHIBIT E**   EXHIBIT N

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

### 3 Gramercy Park West, LLC

**Effective as of February 1, 2019**

.



GOVERNMENT
EXHIBIT
14

February 1, 2019

**EXHIBIT E**

## 3 Gramercy Park West, LLC
a New York limited liability company

## LIMITED LIABILITY COMPANY AGREEMENT

     **THIS AGREEMENT** is made and entered into as of February 1, 2019 by and between 3 Gramercy Park West, LLC, a New York limited liability company (the "Company") and the DC Trust, a Florida Irrevocable Trust, the member (the "Member").

### RECITALS:

     **WHEREAS,** the Company was organized as a New York limited liability company on July 28, 2005, under and pursuant to the New York Limited Liability Company Act, as amended (the "Act");

     **WHEREAS,** the Company and Member desire to set forth the Members' rights, powers, interests and obligations with respect to the Company and to operate the Company in accordance with the terms of, and subject to the conditions set forth in, this Agreement;

     **NOW, THEREFORE,** in consideration of the mutual promises and agreements made herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

### DEFINITIONS

     As used in this Agreement, the following terms shall each have the meaning specified below (unless the context otherwise requires):

     "**Act**" means the Delaware Limited Liability Company Act, as amended from time to time and any successor statute.

     "**Affiliate**" means, with respect to any Person, any other Person which, at the time of determination, directly or indirectly, through one or more intermediaries Controls, is Controlled by or is under Common Control with such Person.

     "**Agreement**" means this Limited Liability Company Agreement, together with all of its Schedules, as originally executed, and as amended, modified, supplemented or restated from time to time.

     "**Capital Account**" shall mean, with respect to a Member, the Capital Account pursuant to Section 3.6 hereof with respect to the Units held by such Member.

     "**Capital Contribution**" means the cash and fair market value of the other property, including the Initial Contributions and additional contributions, if any, contributed to the capital of the Company by all the Member or any one Member, as the case may be.

     "**Carrying Value**" means, with respect to any Company Property, such Company Property's adjusted basis for U.S. federal income tax purposes, except that the Carrying Values of

all Company Properties shall be adjusted to equal their respective Agreed Values in accordance with the rules set forth in Treasury Regulations Section 1.704-1(b)(2)(iv)(f), except as otherwise provided herein, immediately prior to: (a) the date of the acquisition of any additional Membership Interest by any new or existing Member in exchange for more than a *de minimis* Capital Contribution, (b) the date of the distribution of more than a *de minimis* amount of Company Property (other than a pro rata distribution) to a Member or (c) any other date specified by Treasury Regulations; provided that adjustments pursuant to clauses (a), (b) or (c) above shall be made only if the Manager determines in good faith that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members.  The Carrying Value of any Company Property distributed to any Member shall be adjusted immediately prior to such distribution to equal its fair value.  In the case of any Company Property that has a Carrying Value that differs from its adjusted tax basis, such Carrying Value shall be adjusted by the amount of depreciation calculated for purposes of the definition of "Profit or Loss" rather than the amount of depreciation, amortization and other cost recovery deductions determined for U.S. federal income tax purposes.

> **"Code"** means the Internal Revenue Code of 1986, as now in effect or as hereafter amended or corresponding provisions of future laws.

> **"Company"** shall have the meaning set forth in the preamble.

> **"Company Property"** shall have the meaning set forth in Section 7.1.

> **"Contributed Property"** means property or other consideration (other than cash) contributed to the Company in exchange for Membership Interests.

> **"Control"** means, as to any Person means: (A) the beneficial ownership of fifty percent (50%) or more of the voting interests in such Person, or (b) the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.  The terms "Controlled by," "under Common Control with" and "Controlling" shall have correlative meanings.

> **"Guarantee"**  means any obligation, contingent or otherwise, of any Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of any Person, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation.

> **"Indebtedness"** means, without duplication, (a) obligations for borrowed money or with respect to deposits or advances of any kind, (b) obligations evidenced by bonds, debentures, notes or similar instruments, (c) obligations upon which interest charges are customarily paid, (d)

February 1, 2019

obligations under conditional sale or other title retention agreements relating to property acquired, (e) obligations in respect of the deferred purchase price of property or services (excluding current accounts payable incurred in the ordinary course of business), (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by the applicable Person, whether or not the Indebtedness secured thereby has been assumed, (g) Guarantees of Indebtedness of others, (h) all Capital Lease Obligations, (i) all obligations, contingent or otherwise, in respect of letters of credit and letters of guaranty and (j) obligations, contingent or otherwise in respect of bankers' acceptances.  The Indebtedness of the Company shall include the Indebtedness of any other entity (including any partnership in which the Company is a general partner) to the extent the Company is liable therefor as a result of the Company's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that the Company is not liable therefor.

"**Initial Contribution**" shall mean the initial capital contribution made by each Member that is indicated in Schedule A hereto.

"**Lien**" means any lien, charge, security interest, option, claim, mortgage, pledge, proxy, voting trust or agreement, obligation, understanding or arrangement or other restrictions on title or transfer of any nature whatsoever.

"**Manager**" shall have the meaning set forth in Section 5.1.

"**Members**"  shall mean those Persons listed in Schedule A, any Person to whom an Membership Interest is issued and who is admitted as a new Member pursuant to the terms of this Agreement.

"**Membership Interest**" means, with respect to any Member at any time, the entire interest of such Member in the Company at such time.  Such interest includes, without limitation, (a) all rights of a Member to receive distributions of revenues, allocations of income and loss and distributions of liquidation proceeds under this Agreement and (b) all management rights, voting rights or rights to consent.

"**Officers**" shall have the meaning set forth in Section 5.9.

"**Person**" means any individual, corporation, partnership, joint venture, limited liability company, association, joint-stock company, trust, unincorporated organization or Governmental Body or any other entity or association.

"**Profit or Loss**" for any fiscal year or other period, means the taxable income or loss of the Company, or particular items thereof, determined in accordance with the accounting method used by the Company for U.S. federal income tax purposes with the following adjustments:

(a) any item of income, gain, loss or deduction allocated pursuant to Section 4.2 shall not be taken into account in computing such taxable income or loss;

Case 1:18-cr-20685-KMW   Document 383-14   Entered on FLSD Docket 04/29/2021   Page 5 of

**EXHIBIT E**

(b) any income of the Company that is exempt from U.S. federal income taxation and not otherwise taken into account in computing Profits and Losses shall be added to such taxable income or loss;

(c) if the Carrying Value of any Company Property differs from its adjusted tax basis for U.S. federal income tax purposes, any gain or loss resulting from a disposition of such asset shall be calculated with reference to such Carrying Value;

(d) upon an adjustment to the Carrying Value of any Company Property pursuant to the definition of Carrying Value (other than an adjustment in respect of depreciation, amortization or cost recovery deductions), the amount of the adjustment shall be included as gain or loss in computing such taxable income or loss;

(e) if the Carrying Value of any Company Property differs from its adjusted tax basis for U.S. federal income tax purposes the amount of depreciation, amortization or cost recovery deductions with respect to such asset shall for purposes of determining Profits and Losses be an amount which, except as otherwise expressly required by applicable Treasury Regulations, bears the same ratio to such Carrying Value as the U.S. federal income tax depreciation, amortization or other cost recovery deductions bears to such adjusted tax basis (provided that if the U.S. federal income tax depreciation, amortization or other cost recovery deduction is zero, the Manager may use any reasonable method for purposes of determining depreciation, amortization or other cost recovery deductions in calculating Profits and Losses); and

(f) except for items in (a) above, any expenditures of the Company not deductible in computing taxable income or loss, not properly capitalizable and not otherwise taken into account in computing Profits and Losses pursuant to this definition shall be treated as deductible items.

"**Subsidiaries**" of a Person means a corporation, partnership, limited liability company or other business entity of which a majority of the equity capital having ordinary voting power for the election of directors or other governing body (other than equity capital having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person.

"**Treasury Regulations**" shall mean the United States Treasury Regulations promulgated under the Code.

February 1, 2019

**EXHIBIT E**

# ARTICLE I

## ORGANIZATION

      1.1    Formation.  The Company was organized as a limited liability company under and pursuant to the Act by the filing of a Certificate of Formation with the Office of the Secretary of State of New York as required by the Act.  In the event of a conflict between the terms of this Agreement and the Certificate of Formation, the terms of the Certificate of Formation shall prevail.

      1.2    Name.  The name of the Company shall be "3 Gramercy Park West, LLC" or such other name as the Manager may from time to time designate with the approval of holders of a majority of the Membership Interests (measured by the respective Percentage Interests thereof).  To the extent permitted by the Act, the Company may conduct its business under one or more assumed names deemed advisable by the Manager.

      1.3    Purposes; Powers.  The purpose of the Company is to engage in any activity and/or business for which limited liability companies may be formed under the Act.  The Company shall have all the powers necessary or convenient to effect any purpose for which it is formed, including all powers granted by the Act.

      1.4    Duration.  The Company shall continue in existence until the Company shall be dissolved and its affairs wound up in accordance with the Act or this Agreement.

      1.5    Registered Office and Registered Agent; Principal Office.

      (a)    The registered office of the Company required by the Act to be maintained in the State of New York shall be the initial registered office named in the Certificate of Formation or such other office (which need not be a place of business of the Company) as the Manager may designate from time to time in the manner provided by the Act.

      (b)    The registered agent of the Company in the State of New York shall be the initial registered agent named in the Certificate of Formation or such other Person or entity as the Manager may designate in the manner provided by the Act.

      (c)    The principal office of the Company shall initially be located at such place as the Manager may designate from time to time, which need not be in the State of New York, and the Company shall maintain records there for inspection as required by the Act.  The Company may have such other offices as the Manager may designate from time to time.

      1.6    Qualification in Other Jurisdictions.  The Manager shall have authority to cause the Company to be qualified, registered under an assumed or fictitious name, or do business in jurisdictions other than the State of New York if such jurisdiction has enacted a limited liability company statute and the Manager shall have approved the qualification of the Company under such statute to do business as a foreign limited liability company in such jurisdiction.

**EXHIBIT E**

## ARTICLE II

## RIGHTS, POWERS AND OBLIGATIONS OF THE MEMBER

2.1 <u>Members</u>. The Member of the Company as of the date of this Agreement is listed on <u>Schedule A</u> hereto and the address of such Member is as set forth on such <u>Schedule A</u>. As of the date hereof, there are no other Member of the Company and no other Person has any right to take part in the ownership of the Company.

2.2 <u>Investment Representations</u>. The Member hereby represents and warrants as follows:

(a) Such Member is acquiring Membership Interest for investment solely for such Members' own account and not for distribution, transfer or sale to others in connection with any distribution or public offering.

(b) Such Member is financially able to bear the economic risk of an investment in the Company and has no need for liquidity in this investment.

(c) Such Member has such knowledge, experience and skill in financial and business matters in general and with respect to investments of a nature similar to an investment in the Company so as to be capable of evaluating the merits and risks of, and making an informed business decision with regard to, this investment. Such Member acknowledges and understands that the purchase of Membership Interest involves an investment in a speculative investment with no assurance of success.

(d) Such Member(i) have received all information that such Member deems necessary to make an informed investment decision with respect to an investment in the Company; (ii) has had the unrestricted opportunity to make such investigation as such Member desires pertaining to the Company and an investment therein and to verify any information furnished to such Members; and (iii) have had the opportunity to ask questions of representatives of the Company concerning the Company and such Members' investment.

(e) Such Member understands that such Member must bear the economic risk of an investment in the Company for an indefinite period of time because (i) the Membership Interests have not been registered under the Securities Act of 1933 or any applicable state securities laws and (ii) the Membership Interests may not be sold, transferred, pledged or otherwise disposed of except in accordance with this Agreement and then only if they are subsequently registered in accordance with the provisions of the Securities Act and applicable state securities laws or registration under the Securities Act or any applicable state securities laws is not required.

(f) Such Member understand that the Company is not obligated to register the Membership Interests for resale under the Securities Act or any applicable state securities laws and that the Company is not obligated to supply such Member with information or assistance in complying with any exemption under the Securities Act or any applicable state securities laws. Upon the request of the Company, such Member will provide the Company with an opinion of counsel satisfactory to the Company that a proposed resale of the Membership Interests complies with the Securities Act or any applicable state securities laws.

**EXHIBIT E**

2.3. <u>Admission of New Members</u>. Additional Members of the Company may only be admitted to the Company upon written approval of the existing Member.

2.5. <u>Limitation of Liability</u>. No Members hall have any liability to any third party for any debt or obligation solely by virtue of being a Member.

2.6. <u>Company Debt Liability</u>. No Member will be personally liable for any liabilities, debts or obligations of the Company.

2.7. <u>Rights</u>. Except as otherwise expressly provided in this Agreement, the Member shall be entitled to participate in the control and management of the Company, and shall have the right to sign for or bind the Company.

## ARTICLE III

## FUNDING OF THE COMPANY

3.1 <u>Initial Contribution</u>. The Member have heretofore contributed to the capital of the Company the amount set forth as such Members' Initial Contribution (the "<u>Initial Contribution</u>") on <u>Schedule A</u>.

3.2 <u>Membership Interest</u>. Each Member shall own the percentage of beneficial interests on the Company indicated on <u>Schedule A</u> hereto (collectively the "<u>Percentage Interests</u>" and each a "<u>Percentage Interest</u>").

3.3 <u>Further Capital Contributions</u>.

(a)    The Member may make further Capital Contributions.
(b)    The Member shall not be obligated to make any Capital Contributions other than the Initial Contributions.

3.4 <u>Return of Capital Contributions</u>. The Member shall have the right to withdraw Capital Contributions to the Company.

3.5 <u>Interest</u>. No interest shall be paid by the Company on Capital Contributions or on balances in Members' Capital Accounts.

3.6. <u>Capital Accounts</u>. A capital account (each a "<u>Capital Account</u>") shall be established and maintained for the Member in a manner reasonably designated by the Manager.

## ARTICLE IV

## ALLOCATIONS AND DISTRIBUTIONS

4.1. <u>General Allocation Rule</u>. Except as otherwise provided in this <u>Article IV</u>, the Profit or Loss of the Company for each fiscal year (or other applicable period) shall be allocated among the Member in proportion to their Percentage Interests.

**EXHIBIT E**

    4.2.   <u>Special Allocations</u>. The Manager shall make any special allocations it deems reasonable.

    4.3.   <u>Fiscal Year</u>. Except as otherwise required by the Code, the fiscal year of the Company for tax and accounting purposes shall be the twelve (12) month (or shorter) period ending on the last day of December of each year.

## ARTICLE V

## MANAGEMENT

    5.1   <u>Management of Business</u>. Except as otherwise expressly provided in this Agreement, the powers of the Company shall be exercised by, and the ordinary business and affairs of the Company shall be managed under the direction of, a Manager (the "<u>Manager</u>"). The Manager shall hold office until the election and qualification of his or her successor, or until his earlier death, or resignation or removal pursuant to <u>Section 5.6</u>.

    5.2   <u>Appointment</u>. There shall be a Manager at all times that this Agreement remains in effect. The Member shall have right to appoint the Manager. As of the date of this Agreement, the Manager is Olympia De Castro. At any future time when the office of Manager shall be vacant for any reason, the Manager of the Company shall be the existing Manager of the Members.

    5.3   <u>General Powers of Manager</u>. Except as may otherwise be expressly provided in this Agreement, the Manager shall have the exclusive power, authority and complete discretion in the management and control of the ordinary business and affairs of the Company, including the right to make and control all ordinary and usual decisions concerning the business and affairs of the Company. The Manager shall possess all power, on behalf of the Company, to do or authorize the Company or to direct the executive officers of the Company, on behalf of the Company, to do all things necessary or convenient to carry out the business and affairs of the Company. Notwithstanding the foregoing, the Manager shall, at all times, cause the Company to comply with this Agreement and the Certificate.

    5.4   <u>Limitations on Powers of Manager</u>. The enumeration of powers in this Agreement shall not limit the general or implied powers of the Manager or any additional powers provided by law.

    5.5   <u>Compensation</u>. The Manager's compensation shall be determined by the Members.

    5.6   <u>Officers</u>. The Manager shall have the right to appoint officers (the "<u>Officers</u>") of the Company, including a President, one or more Vice Presidents, a Chief Financial Officer, a Chief Operating Officer and/or a Secretary, to assist with the day-to-day management of the business and affairs of the Company and may delegate to such officers such powers and

Case 1:18-cr-20685-KMW   Document 517-5   Entered on FLSD Docket 12/16/2021   Page 10 of
Case 1:18-cr-20685-KMW   Document 383-14   Entered on FLSD Docket 04/29/2021   Page 10 pf
**EXHIBIT E**

responsibilities as the Manager deems appropriate. Each officer shall, at all times, be subject to the direction of the Manager and, except as the Manager may otherwise specify shall have such powers and duties as would customarily be assigned to officers holding comparable positions in a corporation organized under the Delaware General Corporation Law.

      5.7    Standard of Care; Liability. The Manager shall discharge his duties as a manager in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner he reasonably believes to be in the best interests of the Company.

      5.8    Limitation on Liability of the Managers. The doing of any act or the failure to do any act by the Manager, the effect of which may cause or result in loss or damage to the Company or any Member, shall not subject the Manager to any liability to the Company or any Member unless the act or omission to act (i) constitutes gross negligence, bad faith or willful misconduct, (ii) constitutes a breach of such Manager's duty of loyalty to the Company or the Members, (iii) resulted in such Manager or a Related Person of such Manager deriving a personal benefit not approved in accordance with this Agreement, to the extent applicable, or (iv) constitutes a breach of this Agreement, the Act, the Certificate, or employment agreement, if applicable.

## ARTICLE VI

## POWERS RESERVED BY THE MEMBERS; MEETINGS OF MEMBERS

      6.1    Powers reserved by the Members. The Members have the authority and power to act for or on behalf of the Company, to do any act that would be binding on the Company, or to incur any expenditures on behalf of the Company. No Member shall be liable for the debts, obligations or liabilities of the Company.

      6.2.    Place of Meetings. Neither regular nor special meetings of the Members shall be required in order to conduct the business and affairs of the Company or to take any action with respect thereto.

      6.3.    Call of Meetings. A Meeting of the Members for any proper purpose or purposes may be called at any time by the Manager or Members.

      6.4.    Notice. A written notice stating the place, day, hour and purposes for which a meeting is being called shall be delivered not less than two (2) nor more than thirty (30) days before the date of the meeting to each Member entitled to vote.

      6.5.    Waiver of Notice. Attendance of the Members at a meeting shall constitute a waiver of notice of the meeting. Notice of a meeting may also be waived in writing.

      6.6.    Quorum. The presence, either in person or by proxy, of the Members is required to constitute a quorum at any meeting.

      6.7.    Voting. The Members hall be entitled to vote on any matter submitted to a vote of the Members.

6.8.    _Conduct of Meetings_.  The Members shall serve as chairperson of any meeting and shall further designate a Person to take minutes of any meeting.  The chairperson shall have the power to adjourn the meeting from time to time, without notice, other than announcement of the time and place of the adjourned meeting.  Upon the resumption of such adjourned meeting, any business may be transacted that might have been transacted at the meeting as originally called.

6.9.    _Action by Written Consent_.  Any action that may be taken at a meeting of the Member may be taken without a meeting if a consent in writing, setting forth the action to be taken, shall be signed and dated by the Members.

6.10.    _Conference Telephone Meetings_.  Meetings of the Member may be held by means of conference telephone or similar communications equipment so long as all Persons participating in the meeting can hear and communicate with each other. Participation in a meeting by means of conference telephone shall constitute presence in person at such meeting, except where a Person participates in the meeting for the express purpose of objecting to the transaction of any business there at on the ground that the meeting is not lawfully called or convened.

6.11.    _Record Date_. For all purposes, the date on which notice of the meeting is mailed shall be the record date.

## ARTICLE VII

## OWNERSHIP OF COMPANY PROPERTY

7.1    All interests, properties, whether real or personal, rights of any type owned or held by the Company, whether owned or held by the Company at the date of its formation or thereafter acquired (collectively, "Company Property"), shall be deemed to be owned by the Company as an entity, and no Member or Manager, individually or collectively, shall have any ownership interest in such Company Property or any portion thereof. Title to any or all Company Property may be held in the name of the Company or one or more nominees, as the Manager may determine. All Company Property shall be recorded as the property of the Company on its books and records, irrespective of the name in which legal title to such Company Property is held.

## ARTICLE VIII

## FISCAL MATTERS; BOOKS AND RECORDS

8.1.    _Bank Accounts; Investments_.  Capital Contributions, revenues and any other Company funds shall be deposited by the Company in a bank account established in the name of the Company, or shall be invested by the Company, at the direction of the Manager, in furtherance of the purposes of the Company.  No other funds shall be deposited into Company bank accounts or commingled with Company investments.  Funds deposited in the Company's bank accounts may be withdrawn only to be invested in furtherance of the Company's purposes, to pay Company debts or obligations or to be distributed to the Member pursuant to this Agreement.

Case 1:18-cr-20685-KMW   Document 383-14   Entered on FLSD Docket 04/29/2021   Page 12 of

**EXHIBIT E**

8.2. <u>Records Required by Act; Right of Inspection</u>. (a) During the term of the Company's existence and for a period of four (4) years thereafter, there shall be maintained in the Company's principal office all records required to be kept pursuant to the Act, including, without limitation, a current list of the names, addresses and Membership Interests held by each of the Member(including the dates on which each of the Member became a Member), copies of U.S. federal, state and local information or income tax returns for each of the Company's tax years, copies of this Agreement and the Certificate of Formation, including all amendments or restatements, and correct and complete books and records of account of the Company.

8.3. <u>Books and Records of Account</u>. The Company shall maintain adequate books and records of account that shall be maintained on the accrual method of accounting and on a basis consistent with appropriate provisions of the Code, containing, among other entries, a Capital Account for each class of Membership Interests held by each Member.

8.4. <u>Tax Returns and Information</u>. The Member intends for the Company to be treated as a partnership for tax purposes. The Company shall prepare or cause there to be prepared all U.S. federal, state and local income and other tax returns that the Company is required to file. As soon as practicable after the end of each year, the Company shall send or deliver to each Person who was a Member at any time during such year such tax information as shall be reasonably necessary for the preparation by such Person of such Person's U.S. federal income tax return and state income and other tax returns.

8.5. <u>Delivery of Financial Statements to Members</u>. As to each fiscal year of the Company, the Manager shall send to each Member a copy of (i) the balance sheet of the Company as of the end of such fiscal year, (ii) an income statement of the Company for such fiscal year and (iii) a statement showing any distributions made by the Company to Member during such fiscal year. Such financial statements shall be delivered no later than ninety (90) days following the end of each fiscal year.

8.7. <u>Tax Elections</u>. The Company shall make the appropriate elections on the appropriate tax returns.

8.8. <u>Tax Matters Member</u>. The Member shall be the "tax matters partner" (the "Tax Matters Member") of the Company pursuant to Section 6231(a)(7) of the Code. Such Member shall take such action as may be necessary to cause each other Member to become a "notice partner" within the meaning of Section 6223 of the Code. Such Member shall inform each other Member of all significant matters that may come to its attention in its capacity as "Tax Matters Member" by giving notice thereof within a reasonable time after becoming aware thereof. Such Member may not take any action contemplated by Sections 6222 through 6232 of the Code without the consent of all the Members.

8.9. <u>Code Section 83 Safe Harbor Election</u>. By executing this Agreement, the Members authorize and direct the Company to elect to have the "Safe Harbor" described in the proposed Revenue Procedure set forth in Internal Revenue Service Notice 2005-43 (the "IRS Notice") apply to any interest in the Company transferred to a service provider by the Company on or after the effective date of such Revenue Procedure (or any substantially similar Revenue

**EXHIBIT E**

Procedure or other guidance issued by the Internal Revenue Service) in connection with services provided to the Company.

8.10  Taxes and Taxing Jurisdiction. To the extent that the laws of the United States or any state, local or non-United States government requires so, the Company may withhold and pay over to such Taxing Jurisdiction the amount of any tax, penalty, or interest required to be withhold and paid under such laws with respect to items of income, gains, and other amounts allocable to any Member hereunder. Any such payment shall be treated as a distribution to the Members.

# ARTICLE IX

# INDEMNIFICATION; LIMITATION OF LIABILITY

9.1  Indemnification and Advancement of Expenses.

(a)  The Company shall indemnify any Person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the Company), by reason of the fact that he, she or it is or was (i) a Manager, Member, officer, employee, representative or agent of the Company or the Members, or is or was serving at the request of the Company as a director, officer, manager, employee, representative or agent of another corporation, limited liability company, general partnership, limited partnership, joint venture, trust, business trust or other enterprise or entity, or (ii) a party to a guarantee or any other agreement at the request of the Company, in each case against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him, her or it in connection with such action, suit or proceeding if he, she or it acted in good faith and in a manner he, she or it reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his, her or its conduct was unlawful.

(b)  Expenses (including attorneys' fees) incurred by the Manager, or a Member in defending any civil, criminal, administrative or investigative action, suit or proceeding shall be paid by the Company in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such Manager, or Member to repay such amount if it shall ultimately be determined that such Member is not entitled to be indemnified by the Company pursuant to this Section 9.1. Such expenses (including attorneys' fees) incurred by other officers, employees, representatives and agents shall be so paid upon such terms and conditions, if any, as the Manager deems appropriate.

(c)  The indemnification and advancement of expenses provided by, or granted pursuant to, this Section 9.1 shall continue as to a Person who has ceased to be a Manager, Member, officer, employee, representative, agent or party to the guarantees or agreements set forth in Section 9.1 and shall inure to the benefit of the heirs, executors and administrators of such Person.

(d)  Notwithstanding anything in this Article to the contrary, the Company will not have the obligation of indemnifying any Person with respect to proceedings, claims or actions initiated or brought voluntarily by such Person and not by way of defense.

13

**EXHIBIT E**

9.2.    Insurance.  The Company may purchase and maintain insurance or make another arrangement on behalf of any Person who is or was a Manager, Member, officer, employee, agent or other Person identified in Section 9.1 against any liability asserted against such Person or incurred by such Person in such a capacity or arising out of the status of such a Person, whether or not the Company would have the power to indemnify such Person against that liability under Section 9.1 or otherwise.

9.3    Limit on Liability of Members. The indemnification set forth in this Article IX shall in no event cause the Member to incur any personal liability, nor shall it result in any liability of the Member to any third party.

## ARTICLE X

## DISSOLUTION AND WINDING UP

10.1    Events Causing Dissolution.  The Company shall be dissolved upon the first of the following events to occur:

(a)    The written consent of the Members; and

(b)    The occurrence of any other event that causes the dissolution of a limited liability company under the Act.

10.2    Winding Up.  If the Company is dissolved pursuant to Section 10.1, the Company's affairs shall be wound up as soon as reasonably.

## ARTICLE XI

## TRANSFERS OR ASSIGNMENTS OF MEMBERSHIP INTERESTS

11.1.    Prohibited Transfers.  The Member agrees with the Company that such Members shall not transfer or assign any Membership Interest or part thereof (directly or indirectly, by operation of law or otherwise) without first complying with the requirements set forth in this Article XI.

11.2.    Transfer to Subsidiaries and Affiliates.  The rules of this Article XI shall not apply to the assignment or transfer of any Membership Interest to a wholly-owned Subsidiary of the transferring Member; provided, however, that prior to causing or permitting such transferee to cease being a wholly-owned Subsidiary of the transferor, the transferor shall first cause the transferee to transfer such Membership Interest to the transferor or another wholly-owned Subsidiary of the transferor.

## ARTICLE XII

## MISCELLANEOUS PROVISIONS

12.1    General Representations.  The Member hereby represent and warrant to the Company that: (i) he has the full right and authority to enter into this Agreement and perform his

obligations hereunder; (ii) execution of this Agreement and his performance hereunder will not violate any obligations or agreements of such Member to any third parties; and (iii) has not granted, nor will grant, any right, do any act or enter into any agreement whatsoever that may or will prevent or hinder the full performance of obligations hereunder.

        12.2    Counterparts.  This Agreement may be executed in several counterparts, each of which will be deemed an original but all of which will constitute one and the same agreement.

        12.3    Entire Agreement.  This Agreement constitutes the entire agreement among the parties hereto and contains all of the agreements among such parties with respect to the subject matter hereof.  This Agreement supersedes any and all other agreements, either oral or written, between such parties with respect to the subject matter hereof.

        12.4    Partial Invalidity.  Wherever possible, each provision hereof shall be interpreted in such manner as to be effective and valid under applicable law, but in case any one or more of the provisions contained herein shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such provision shall be ineffective to the extent, but only to the extent, of such invalidity, illegality or unenforceability without invalidating the remainder of such invalid, illegal or unenforceable provision or provisions or any other provisions hereof, unless such a construction would be unreasonable.

        12.5    Amendment.  This Agreement may be amended, supplemented or modified only with the favorable vote of the Member holding at least 66.67% of the aggregate Percentage Interests in the Company.

        12.6    Assignments.  The Member may assign in whole or in part its Membership Interest as provided in Article XI.  If the Member transfer all interest in the Company pursuant to this Section and Article XI, the transferee shall be admitted to the Company upon its execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement. Such admission shall be deemed effective immediately prior to the transfer, and, immediately following such admission, the transferor Member shall cease to be a member of the Company.

        12.7    Binding Effect; Benefit. Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and shall inure to the benefit of the parties, and their respective distributees, heirs, successors and permitted assigns.

        12.8    Governing Law; Jurisdiction. (a) This Agreement shall be governed by and construed in accordance with the local, internal laws of the State of New York (without regard to conflict of laws principals).  In particular, this Agreement is intended to comply with the requirements of the Act and the Certificate of Formation of the Company.  In the event of a direct conflict between the provisions of this Agreement and the mandatory provisions of the Act or any provision of the Certificate of Formation of the Company, the Act and the Certificate of Formation of the Company, in that order of priority, will control.

        (b)    The parties to this Agreement, acting for themselves and for their respective successors and assigns, without regard to domicile, citizenship or residence, hereby expressly and irrevocably submit to, as the exclusive forum for the determination of all disputes arising under or

in connection with this Agreement, the jurisdiction of the United States District Court for the Southern District of New York and the jurisdiction of any court of the State of New York sitting in the County of New York. Each of the parties hereto hereby waives any claims of inconvenient form or venue. Service of process, notices and demands of such arbitration board, and any other notices or other communications required or permitted under this Agreement, shall be deemed given if in writing and delivered personally or mailed as required by Section 12.13 below.

12.9    Terms Generally. The definitions of terms in this Agreement shall apply equally to the singular and plural forms of the terms defined. The term "and/or" is used herein to mean both "and" as well as "or." The use of "and/or" in certain contexts in no respects qualifies or modifies the use of the terms "and" or "or" in others. "Or" shall not be interpreted to be exclusive unless the context otherwise requires; and "and" shall not be interpreted to require the conjunctive, in each case unless the context otherwise requires. The terms "include" and "including" are to be construed as non-exclusive (so that, by way of example and for the avoidance of doubt, "including" shall mean "including without limitation"), in each case unless the context otherwise requires.

12.10    Offset. Whenever the Company is to pay any sum to any Member, any amounts that Member owes the Company may be deducted from that sum before payment.

12.11    Effect of Waiver or Consent. A waiver or consent, express or implied, to or of any breach or default by any Person in the performance by that Person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person with respect to the Company. Failure on the part of a Person to complain of any act of any Person or to declare any Person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that Person of its rights with respect to that default until the applicable statute-of-limitations period has run.

12.12    Further Assurances. In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and such transactions.

12.13    Notices. Any notice, demand, consent, election, offer, approval, request, or other communication required or permitted under this Agreement (collectively, "Notices") must be in writing (except where telephonic notice is specifically permitted hereunder) and either delivered personally or sent by certified or registered mail, postage prepaid, return receipt requested or by facsimile transmission with receipt confirmed. A Notice must be addressed to a Member at the Member's address as listed on Schedule A. A notice that is sent by mail will be deemed given three (3) business days after it is mailed while a Notice that is delivered personally shall be deemed given upon receipt. Any party to this Agreement may, by Notice to all of the other parties: (x) designate one or more additional Persons to receive copies of any Notices given to such party and/or (y) substitute address(es) for receipt of Notices by such party or any Person referred to in clause (x).

Case 1:18-cr-20685-KMW   Document 383-14   Entered on FLSD Docket 04/29/2021   Page 17 of

**EXHIBIT E**

12.14   <u>Creditors</u>. None of the provisions of this Agreement shall be for the benefit of, or enforceable by, any creditor of the Member or of the Company. No creditor who makes a loan to the Member or to the Company may have or acquire, solely as a result of making such loan, any membership interest or interest in the profits or property of the Company, other than such membership interest or interest in the profits or property of the Company that may be expressly granted to such creditor, with the written consent of the Member, pursuant to the terms of such loan.

12.15   <u>Interpretation</u>. Each definition in this Agreement includes the singular and the plural, and reference to the neuter gender includes the masculine and feminine where appropriate. References to any statute or Treasury Regulations means such statute or regulations as amended at the time and include any successor legislation or regulations. The headings to the Articles and Sections are for convenience of reference and shall not affect the meaning or interpretation of this Agreement. Except as otherwise stated, reference to Articles, Sections and Schedules mean the Articles, Sections and Schedules of this Agreement. The Schedules to this Agreement are hereby incorporated by reference into and shall be deemed a part of this Agreement.

*[Remainder of page intentionally left blank. Signatures follow.]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement to be effective as of the date first above written.

**3 Gramercy Park West, LLC**

By: _____
     Name: Olympia De Castro
     Title:  Manager

**MEMBER:**

_____
     Name: DC Irrevocable Trust
     Title:  Trustee

February 1, 2019

Case 1:18-cr-20685-KMW   Document 383-14   Entered on FLSD Docket 04/29/2021   Page 19 of

**EXHIBIT E**

## Schedule A

| Member | Initial Contribution | Percentage Interest | Address |
|---|---|---|---|
| DC Irrevocable Trust | A contribution of the assets and liabilities. | 100% | 597 Hibiscus Lane<br>Miami, FL 33137<br><br>with a copy to:<br>Trenam Law<br>Atte.: Tate Taylor, Esq.<br>101 East Kennedy Boulevard, Suite 2700, Tampa, FL 33602 |

February 1, 2019

**EXHIBIT E**

# NAGEL GALERIE DRAXLER

*Verkauf an:*

Global Finance Management, Corp.
701 Brickell Avenue
Miami, Florida, 33131
USA

*Anlage 2*

Cologne, December 23, 2014

**INVOICE**                                                    14/78

**HEIMO ZOBERNIG**
*Ohne Titel* 2000 (HZ 2000-045)
Acryl/Leinwand
100 x 100 cm                                          **USD 37,940.00**

Please make transfer of USD 37,940.00 to our account:

Galerie Nagel Draxler GbR
Christian Nagel & Saskia Draxler
Deutsche Bank PGK
An den Dominikanern 11-27
50668 Cologne
Germany

account no.    1056589 00
bank code:     370 700 24
Swift Code:    DEUTDEDBKOE
IBAN:          DE92370700240105658900

Tax no..:      215 / 5797 / 0643
VAT no.        DE 288884738

period of performance: December 2014

**GOVERNMENT EXHIBIT 15**

Galerie Nagel Draxler GbR
Christian Nagel / Saskia Draxler
Brüsseler Str. 85
50672 Köln
T: +49 221 257 0591
F: +49 221 257 0592
koeln@nagel-draxler.de
www.nagel-draxler.de

**EXHIBIT E**



Heimo Zobernig
*ohne Titel (HZ 2000-045)*, 2000
Acryl auf Leinwand
100h x 100w cm
39.37h x 39.37w in

# NAGEL ⁜ DRAXLER

November 20, 2018

To Whom It May Concern
United States Magistrate Judge
Wilkie D. Ferguson, Jr. United State Courthouse 400 North Miami Avenue
Miami, Florida 33128
Re: Case No. 18-CR-20685-Williams/Torres

My name is Christian Nagel, born 6th December 1961 in Munich. Together with my wife and business partner Saskia Draxler I am running galleries for contemporary art in Berlin and in Cologne, Germany. I am working as a gallerist since 1986.
The standard of our galleries can be rated highly, as we represent international well-known artists. We participate in the most important international art fairs.

At Art Basel Miami Beach in 2001, I first met Gustavo Hernandez Frieri. He came to my booth, asked for a painting, which he not much later bought. This was the beginning of a long acquaintance. Already in the first year he invited me to his home and introduced me to his later wife Olympia Castro. We mainly spoke about art, literature and music and I saw that this young banker had an enormous background in culture.

Gustavo has a very worked out and detailed knowledge in a lot of important human fields and is an empathic thinker. In our many discussions about art and culture I learned that he is a man with highest ethical standards. It seems to me that he also transfers these high standards to his activities in the business world.

Gustavo is a very sensitive man who cares about the people and his environment. In all our encounters, he acted honest and trustful.

I am proud to say, that over the years we became close friends, and I can say for sure: I'll take my oath for him.

Respectfully Yours,

*Christian Nagel*

Christian Nagel

GOVERNMENT
EXHIBIT
16

Galerie Nagel Draxler GmbH
Brüsseler Str. 85
50672 Köln
T: +49 221 257 0591
F: +49 221 257 0592
koeln@nagel-draxler.de
www.nagel-draxler.de

Die Gesellschaft ist im Handelsregister des Amtsgerichts Köln unter HR B 90923 eingetragen.

*Bestandspapier : (0 Lauf aus am 27.06.2021*

**EXHIBIT E**

From

To:
Galerie Nagel Draxler GmbH
c/o Art Basel Messeplatz 10
Hall 2.1, booth S16
4058 Basel
Switzerland

To:
Galerie Nagel Draxler GmbH
Brüsseler Straße 85
50672 Cologne
Germany

# NAGEL ⸱ DRAXLER

Basel, 17 June 2019

*– Anlage 3*

## Proforma invoice



Michael Krebber
*Untitled*, 2001
Oil on canvas
120h x 100w cm
47.24h x 39.37w in

USD 212.500,00



Michael Krebber
*Untitled*, 1995
Watercolor on paper
20.32h x 15.24w cm
8h x 6w in

USD 17.000,00



Michael Krebber
*Untitled*, 1995
Oil on canvas
20.32h x 20.32w cm
8h x 8w in

USD 17.000,00



Michael Krebber
*Untitled*, 1995
Watercolor, pen on paper
20.32h x 15.24w cm
8h x 6w in

USD 17.000,00



Michael Krebber
*Untitled*, 1995
Watercolor on paper
8h x 6w cm
3.15h x 2.36w in

USD 17.000,00



Michael Krebber
*Untitled*, 1995
Watercolor, ink, gouache, pen, glue on paper
20.32h x 15.24w cm
8h x 6w in

USD 17.000,00

Galerie Nagel Draxler GmbH
Weydingerstraße 2/4
10178 Berlin
T: +49 30 400 42 641
F: +49 30 400 42 642
berlin@nagel-draxler.de
www.nagel-draxler.de

Die Gesellschaft ist im Handelsregister des Amtsgerichts Köln unter HR B 90923 eingetragen.

GOVERNMENT
EXHIBIT
17

**EXHIBIT E**



Michael Krebber
*Untitled*, 1995
Watercolor on paper
27.94h x 20.32w cm
11h x 8w in

USD 17.000,00



Michael Krebber
*Untitled*, 1995
Watercolor, pen, pencil on paper
27.94h x 20.32w cm
11h x 8w in

USD 17.000,00



Martin Kippenberger
*Untitled*, 1991
Oil on canvas
50h x 60w cm
19.69h x 23.62w in

USD 127.500,00

EORI: DE522612337352676

**EXHIBIT E**

EUROPÄISCHE GEMEINSCHAFT

| 8 | 2 Versender / Ausführer Nr.<br>Galerie Nagel Draxler GmbH c/o Art Basel 2019<br>Messeplatz 10<br>CH- 4005 Basel | 1 ANMELDUNG | A BESTIMMUNGSSTELLE |
|---|---|---|---|

EU | A | ×××××

3 Vordrucke | 4 Ladelisten
| ×××××

5 Positionen | 6 Packst. insgesamt | 7 Bezugsnummer
1 | ××××××× | BTK0319060017-2

8 Empfänger Nr.  DE522612337352676
Galerie Nagel Draxler GmbH
Brüssler Straße 85

DE- 50672 Köln

9 Verantwortlicher für den Zahlungsverkehr Nr.
××××××××××××××××××××××××××××××

10 Letztes Herkunftsland | 11 Hand./Erz. | 12 Angaben zum Wert | 13 G.L.P.
××× land | s.16 Land | ××××××××××××× | ×××××

14 Anmelder/Vertreter Nr.  [1]s. Feld 8; [2] DE5050383
[2] Brandl Transport GmbH
Robert Perthel Str.20-22
D- 50739 Köln/ Cologne
[1] siehe Feld 8 (Empf.)

15 Versendungs-/Ausfuhrland
Schweiz

16 Ursprungsland
Drittland

15 Vers./Ausf.L.Code | 17 Bestimm.L.Code
a) CH | b) ×× | a) DE | b) 11

17 Bestimmungsland
××××××××××××××××××

18 Kennzeichen und Staatszugehörigkeit des Beförderungsmittels bei der Ankunft
LKW | DE | 19 Ctr. 0

20 Lieferbedingung
EXW| Basel

21 Kennzeichen und Staatszugehörigkeit des grenzüberschreitenden aktiven Beförderungsmittels
LKW | DE

22 Währung u. in Rechn. gestellter Gesamtbetr.
USD| 459.000,00

23 Umrechnungskurs
1,1171

24 Art des Geschäfts
6 | 9

25 Verkehrszweig an der Grenze | 26 Inländischer Verkehrszweig | 27 Entladeort
3 | 3 |

28 Finanz- und Bankangaben
×××××××××××××××××××××××××××××××××××

8 | 29 Eingangszollstelle
DE004055

30 Warenort

31 Packstücke und Warenbezeichnung
1 PK; gez. Adresse

9 Gemälde von div. Künstlern. lt. Liste

32 Positions-Nr. 1

33 Warennummer
9701 1000 | 00 | 0

34 Ursp.land Code | 35 Rohmasse (kg) | 36 Präferenz
a) s.16 | b)×× | 97,5 | 100

37 VERFAHREN | 38 Eigenmasse (kg) | 39 Kontingent
5300 | D25 | 45,0

40 Summarische Anmeldung/Vorpapier
AT/B/15/003787/06/2019/7202

41 Besondere Maßeinheit | 42 Artikelpreis | 43 B.M.
| 459.000,00 | ×

44 Besondere Vermerke/ Vorgelegte Unterlagen/ Bescheinigungen u. Genehmigungen
[X] Hinsichtlich aller angemeldeten Waren zum vollen Vorsteuerabzug berechtigt.
Wir bitten um Abfertigung auf Verwendungsschein: 24 Monate
Artikel 234(3) UZK-DA, VV-Ware 10500
Ort der Verwendung: Feld 8
Frachtkosten: 375,00 €

Code USD as Berichtigung
××× | ××××××××××

46 Statistischer Wert
411.072,83 EUR

47 Abgabenberechnung

| Art | Bemessungsgrundlage | Satz | Betrag | ZA |
|---|---|---|---|---|
| B00 | 411260,33 | 7% | 28788,22 | |
| | | | | |
| | Summe: | | 28788,22 | |

48 Zahlungsaufschub

49 Bezeichnung des Lagers

B ANGABEN FÜR VERBUCHUNGSZWECKE

50 Hauptverpflichteter Nr.  Unterschrift:  C ABGANGSSTELLE

××××××××××××××××××××××××××××××××××

51 Vorgesehene Durchgangszollstellen (und Land)
vertreten durch
Ort und Datum:
×××××××× | ××××××××× | ××××××××× | ××××××××× | ×××××××× | ×××××××××

52 Sicherheit  Code | 53 Bestimmungsstelle (und Land)
nicht gültig für ×××××××××××××××××××××××××××× | ×× | ×××××××××××××××××××××

J PRÜFUNG DURCH DIE BESTIMMUNGSSTELLE

54 Ort und Datum:
Köln, 21.06.2019
Unterschrift und Name des Anmelders/Vertreters:
Brandl Transport GmbH
Robert-Perthel-Strasse 20-22
DE 50739 Köln
Patricia Zehnpfennig

# EXHIBIT E

| | Ggf. Vorpapier (Nummer, Datum) | Zu Zollbeleg (Nummer, Datum) |
|---|---|---|
Zutreffendes ist angekreuzt [X] oder ausgefüllt  (VSF Z 19 01)

**Zusatzblatt zum Einheitspapier**
**für die Überführung von Waren**
**in die vorübergehende Verwendung**
**- Verwendungsschein -**

Ggf. Vorpapier (Nummer, Datum)
ATB/15/003787/07/2019/7202

Zu Zollbeleg (Nummer, Datum)
ATM/53/000024/06/2019/7202
28.06.2019

Blatt 1 - Für den Anmelder

1. Registrierkennzeichen (nur bei Barsicherheit)

2. Wurde der Antrag auf Bewilligung in Form einer Zollanmeldung gestellt (Artikel 163 Abs. 1 Buchstabe a UZK-DA), wird die Bewilligung der vorübergehenden Verwendung durch Überlassung der Waren erteilt (siehe Feld 18).

3. Waren gestellt am

4. Zollanmeldung angenommen am
28.06.2019

5. Übereinstimmend mit
☐ Frachtbrief usw.  ☒ Vorpapier

6. Anordnungen für die Zollbehandlung
☒ Unterlagenprüfung
☐ Warenprüfung
☐ ohne Prüfung

7. Gegenstand und Ergebnis der Prüfung; sonstige Vermerke
(z. B. Präferenz oder Berechnung der Sicherheit)

8. Nämlichkeitssicherung
angestempelte Proformarechnung und Abbildungen

9. Entnommen
☒ Statistische Anmeldung  ☐ EKM

10. Bewilligte Verwendung (Art, Umfang, Rechtsgrundlage, ggf. Auflagen)
Verkaufsausstellung, Art. 250 UZK i. V. m. Art. 234 (3) UZK-DA

11. Verwendungsort
siehe Feld 8
Einheitspapier

12. Beförderung
Die Waren dürfen innerhalb des deutschen Teils des Zollgebiets der Union ohne Förmlichkeiten befördert werden.
Die Beförderung über das Gebiet anderer Mitgliedstaaten bei unmittelbarem Verbringen aus dem Zollgebiet der Union ist jedoch zulässig (Artikel 267 Abs. 1 und 5 UZK-IA).

13. Überwachungszollstelle (Bezeichnung, Anschrift)
Hauptzollamt Köln, Zollamt Köln-West, Am Niehler Hafen, 50735 Köln

14. Zollstelle für die Erledigung
☒ Jede dazu befugte deutsche Zollstelle.
☐ Nur folgende Zollstelle (Bezeichnung, Anschrift)

Dieser Verwendungsschein ist bei der Erledigung der vorübergehenden Verwendung dieser Zollstelle vorzulegen.

15. Sicherheit
☐ geleistet  ☒ nicht erforderlich  ☐ Auszahlungsersuchen siehe Rückseite

16. Frist für die Erledigung des Verfahrens
28.06.2021

Eine Verlängerung der Frist kann unter Vorlage dieses Verwendungsscheins bei der Überwachungszollstelle (Feld 13) beantragt werden.

17. Rechtsbehelfsbelehrung siehe Rückseite.

18. Waren überlassen am
28.06.2019

19. Unterschrift des Abfertigungsbeamten, Datum
28.06.2019

**0790-E-** Zusatzblatt zum Einheitspapier für die Überführung von Waren in die vorübergehende Verwendung **(2017)**    1/6

**EXHIBIT E**

*Kauf von:*

Olympia de Castro
597 Hibiscus Lane
Miami, FL 33137
United States

*Anlage 1*

To:
Galerie Nagel Draxler GmbH
Brüsseler Straße 85
50672 Cologne
Germany

Miami, July 17, 2019

**Invoice**



**Kai Althoff**
Untitled, 2004
Oil, spray paint, varnish, dispersion on textile
101h x 99w cm

USD 620,000.00



**Kai Althoff**
Liebe, 2002
Spar varnish, varnish, paper on canvas
60h x 80w x 8d cm

USD 180,000.00



**Kai Althoff**
Immo, 2004
Acrylic, spray paint, enamel on textile
84.50h x 89.50w cm

USD 180,000.00

**TOTAL:**

**USD 960,000.00**



GOVERNMENT
EXHIBIT
18

**EXHIBIT E**

Olympia de Castro
597 Hibiscus Lane
Miami, FL 33137
United States


To:
Galerie Nagel Draxler GmbH
Brüsseler Straße 85
50672 Cologne
Germany


Miami, July 17, 2019


**Invoice**



**Cosima von Bonin**
Untitled (The Purple Bulldog with Box), 2006
Various materials
127h x 91w x 121d cm                    USD 40,000.00

Olympia de Castro
597 Hibiscus Lane
Miami, FL 33137
United States

Please make transfer to the following account:

DC 2019 Irrevocable Trust
Account Nr.: ▮▮▮▮0860
Swift Coce: CHASUS33
Routing No. 267084131
Bank Name: JP Morgan Chase & Co.
Bank Address: 320 Crandon Blvd. Key Biscayne, FL 33149

| | |
|---|---|
| **From:** | Gustavo Hernandez |
| **To:** | Olympia De Castro |
| **Subject:** | Re: 314 Hicks Garden Contract |
| **Date:** | Tuesday, July 14, 2020 9:43:27 PM |

This quote is crazy expensive.
They are a fancy landscape design shop.
Disregard the copper irrigation.
And the servicing must definitely be shopped around to a gardener - not a design shop.

> On Jul 14, 2020, at 6:27 PM, Olympia De Castro
> <olympia.decastro@gmail.com> wrote:

> ---------- Forwarded message ---------
> From: **Lauren Barry** <lbarry@project-plant.com>
> Date: Tue, Jul 14, 2020 at 12:50 PM
> Subject: 314 Hicks Garden Contract
> To: Olympia De Castro <olympia.decastro@gmail.com>

> Hi Olympia -

> Please see attached contract for garden, lighting and irrigation maintenance. Cost
> for the remainder of the season is $7463.38 for visits once ever three weeks.
> The lighting and irrigation maintenance is a flat fee for the season. It includes
> winterizing the system late fall. We bill hourly for garden work and this contract
> is a request for retainer for the season. At the end of the season in December, I'll
> send an invoice for the actual hours we have worked and either bill for any
> additional amounts due or issue a credit. It's very rare we are under our estimated
> contract cost and need to issue a credit. Most often we are very close to contract
> cost but need to send an additional invoice for materials and labor clients request
> throughout the season like more annuals or holiday decorations that weren't
> initially accounted for.

> Also attached is cost to add irrigation to the front planters. We will use copper
> piping and conceal as best as possible. You will see some copper on the stoop but
> we do our best to hide it. Once the copper patinas, it blends into the brownstone.
> Cost for this is $4028.38. There is an alternative to copper which is clear plastic
> tubing. I don't recommend this because it's not very elegant and isn't as durable.
> But, it would save at least a few hundred dollars.

> In the event you need additional services down the line, like design or consulting,
> I have included our full fee schedule as well.

> We do request to be paid before service and we intend to start tomorrow morning.


GOVERNMENT
EXHIBIT
19

EXHIBIT E

We are scheduled to be meeting Ravi at 9am. Any questions, let me know. I can be reached on my cell today 3474523215 or at our Southold Office. Tomorrow I'll be onsite to check things out in person and report back about what new plants I think you will need.

For quick e-payment today you can send to:
Venmo: Lauren-Barry-13
Chase Quickpay/Zelle: ███████████████
Or
Paypal (add 4%) $7761.92+$4189.52

If it is easier to wire funds, I can send you our routing information.


Best,
Lauren


LAUREN BARRY

P R O J E C T
P L A N T

159-1/2 Columbia St
Brooklyn, NY 11231
BK: 347.689.4330
—
56755 Main Rd
Southold, NY 11971
NOFO: 631.407.5348
—
www.project-plant.com
IG: project_plant
lbarry@project-plant.com




--
_____
Olympia A. De Castro
M 917 ████████
olympia.decastro@gmail.com

<314 HICKS_MAINTENANCE CONTRACT 2020.pdf>
<314 HICKS_FRONT STOOP IRRIGATION.pdf>
<2020 FEE SCHEDULE.pdf>

**EXHIBIT E**

<div align="center">

**STANDARD FORM OF SINGLE FAMILY/TOWNHOUSE LEASE**
THE REAL ESTATE BOARD OF NEW YORK, INC.
©Copyright 2019. All Rights Reserved. Reproduction in whole or in part prohibited

</div>

`REBNY Townhouse 2019 Rev 7.19`

**PREAMBLE:** This Lease contains the agreements between Tenant and Owner concerning the rights and obligations of each party. Tenant and Owner have other rights and obligations which are set forth in government laws and regulations.

Tenant should read this Lease carefully.  If Tenant has any questions, or if Tenant does not understand any words or statements herein, obtain clarification from an attorney. Once Tenant and Owner sign this Lease, Tenant and Owner will be presumed to have read it and understood it completely. Tenant and Owner admit that all agreements between Tenant and Owner have been written into this Lease. Tenant understands that any agreements made before or after this Lease was signed and not written into it will not be enforceable.

**THIS LEASE** is made as of _____August_____ _____12_____ _____2020_____ between
                         month          day          year

Owner (hereinafter referred to as "Owner" or "Lessor")  314 Hicks LLC
whose address is  314 Hicks Street, Brooklyn, NY 11201
and  Tenant (hereinafter referred to as "Tenant" or "Lessee")  ▇▇▇▇▇ Moffitt
Whose address is  26 Schermerhorn Street, Brooklyn, NY 11201

> Please note the following paragraphs that require a selection among alternative wording: 2, 3E, 34
> Please note the following paragraphs that require deletions if inapplicable: 9C, 12E, 2S, 32C(i), 33, 34, 35, 36, 37, 38, 60, 61
> Please note the following paragraphs that require the insertion of terms (and/or delete if inapplicable): 1, 2, 3A, 3B, 4, 9C, 12, 2S, 32, 34, 35, 38, Exhibit A (Memorandum Confirming Term), Exhibit B (Owner's Work), Exhibit C (Premises Furniture)

**1.   PREMISES AND USE**

Owner agrees to lease to Tenant the premises located at  314 Hicks Street, Brooklyn, NY 11201  (the "Premises"), in the State of New York. Tenant shall use the Premises for living purposes only and for no other purpose (such restricted purposes includes, but are not limited to, any commercial activity or illegal or dangerous activity).

The Premises may only be occupied by Tenant and the following Permitted Occupants (and occupants as permitted in accordance with Real Property Law §235-f):  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Moffitt .

Tenant acknowledges  hat no other person other than Tenant and the Permitted Occupants may reside in the Premises without the prior written consent of  he Owner.  If Tenant violates any of the terms of this provision, the Owner shall have the right to restrain the same by injunctive relief and/or any other remedies provided for under this Lease and at law and/or equity.

**2.   LEASE COMMENCEMENT DATE; LENGTH OF LEASE**

The "Lease Effective Date" is the date a fully executed Lease is returned to Tenant or Tenant's representative by Owner or its representative.  The "Lease Commencement Date" is  9/1/2020 .  Except as may be provided for otherwise in this Lease, the term (that means the length) of this Lease will begin on the Lease Commencement Date and will end on  5/31/2021  (the "Term"). Tenant acknowledges that notwithstanding anything to the contrary contained in this Lease: (i) the Term of this Lease may be reduced as provided for herein and (ii) the Term shall consist of the period beginning with the Lease Commencement Date through and including, the date that is the last day of the month in which the **[CHOOSE ONE AND CROSS OUT THE OTHER ALTERNATIVES]** [one (1) year][two (2) year][_____ (__) month(s)] anniversary of the Lease Commencement Date occurs.

**3.   RENT**

A.  "Rent" is defined as the base rent due under this Lease.  Tenant's monthly rent for the Premises is $ 17,250  per month. Tenant must pay Owner the Rent, in equal monthly installments, on the first day of each month ei her to Owner at the above address or at another place that Owner may inform Tenant of by written notice.

B.  When Tenant signs this Lease, Tenant must pay by bank or cashier's check (or by electronic fund transfer, if instructed by Owner as described below) the following:

(i)   one (1) months' Rent (i.e., $ 17,250 );

(ii)  the Security Deposit (in the amount stated in Article 4); and

(iii) any commission due by Tenant to the Brokers (as defined in Article 34 hereinafter) in connection with this Lease.

C.  If the Lease Commencement Date shall not occur on the first day of a calendar month, the Rent for such calendar month shall be prorated on a per diem basis. If the Lease begins after the first day of the month, Tenant must pay when it signs this Lease one (1) full months' Rent and  for the next full calendar month Tenant shall pay a prorated Rent based on the number of days the Lease began after the first day of the month (for example, if the beginning date of this Lease is the 16th day of  he month, Tenant would pay for fifteen (15) out of thirty (30) days, or one-half (1/2), of a full months' Rent for the second calendar month). In any event, if the Lease Commencement Date shall not occur on the first day of a calendar month, the Term shall also include the remainder of the month in which the Lease Commencement Date occurred.

D.  Within five (5) business days after the request of Owner, at Owner's option, Tenant shall return a document supplied by Owner in the form attached hereto as Exhibit A (a "Memorandum Confirming Term") confirming  he Lease Commencement Date, the Rent Commencement Date (if different than the Lease Commencement Date), the Lease expiration date and any other material terms of this Lease, certifying that Tenant has accepted delivery of the Premises and that the condition of the Premises complies with Owner's obligations hereunder. Tenant's failure to so deliver the Memorandum Confirming Term shall be considered a material default under this Lease, however, Tenant's failure to do so shall not affect the occurrence of the Lease Commencement Date or the validity of this Lease or alter the terms and provisions contained in the Memorandum Confirming Term if so delivered to Tenant by Owner.

E.  Tenant may be required to pay other charges to Owner under the terms of this Lease, such additional charges shall be referred to as "Additional Rent". Any Additional Rent must be paid upon the earlier of (i) the first day of the month immediately following the mon h said Additional Rent is billed to Tenant or (ii) fifteen (15) days from the date Tenant is billed for the Additional Rent. If Tenant fails to pay the Additional Rent on time, Owner shall have the same rights against Tenant as if Tenant failed to pay Rent. Said Rent and Additional Rent must be paid in full in accordance with the foregoing, without deduction or offset and without the need for demand or notice from Owner. Except as may be provided for otherwise in this Article 3, all Rent and Additional Rent shall be payable to Owner by [check], [direct deposit] **[CROSS OUT ANY FORM OF PAYMENT THAT IS INAPPLICABLE]** or such other form of payment as required by Owner only. If by direct deposit, Owner shall provide Tenant the necessary wiring instructions.

F.  Tenant shall be entitled to a five (5) day grace period for the payment of any sum of Rent or Additional Rent due under this Lease.  Any sum of Rent or Additional Rent not paid within five (5) days of the date due shall be subject to a late fee of the lesser of (i) $50.00, or (ii) five percent (5%) of the unpaid amount. Interest shall also be payable on the aforesaid late Rent or Additional Rent beginning thirty (30) days from the due date, such interest accruing at the lesser of (i) the maximum amount allowable by law, or (ii) one and one-

000374-03                                        1

# EXHIBIT E

half percent per month (1.5%), until the late Rent or Additional Rent is paid in full. There shall be a Fifty Dollar ($50.00) fee for any check which is dishonored or returned. Any late charge or interest charge shall be considered Additional Rent.

G. Owner need not give notice to Tenant to pay Rent. Rent must be paid in full and no amount subtracted from it. The whole amount of Rent is due and payable as of the Lease Commencement Date. Payment of Rent in installments is for Tenant's convenience only. If Tenant is in default under any of the terms and condi ions of this Lease, Owner may give notice to Tenant that Tenant may no longer pay Rent in installments and the entire Rent for the remaining part of the Term will then immediately be due and payable.

### 4.   SECURITY DEPOSIT

Tenant is required to give Owner the sum of $ 17,250           (such amount not to exceed one (1) months' Rent pursuant to The Housing Stability and Tenant Protection Act of 2019) when Tenant signs this Lease as a security deposit ( he "Security Deposit"). Owner will deposit this Security Deposit in                                                                          bank                        at
_____, New York. This Security Deposit shall not bear interest, unless if otherwise required by applicable law. In the event that the Security Deposit shall earn interest, then in such event Owner shall be entitled to an administrative fee pursuant to applicable law.

If Tenant carries out all of Tenant's agreements in this Lease and if Tenant moves out of the Premises and returns it to Owner vacant, broom clean and in the same condition it was in when Tenant first occupied it, except for ordinary wear and tear or damage caused by fire or other casualty through no fault of Tenant, Owner will return to Tenant the full amount of the Security Deposit within fourteen (14) days after the later of (i) the date this Lease ends, or (ii) the date Tenant vacates the Premises. However, if Tenant is in default of Tenant's obliga ions under this Lease and/or there are any damages to the Premises beyond ordinary wear and tear or damage caused by fire or other casualty, Owner may keep all or part of he Security Deposit to cover reasonable repairs of such damage and Owner shall provide Tenant with an itemized statement indicating the basis for the amount of the Security Deposit retained within the aforementioned fourteen (14) day period. Furthermore, for sake of clarity and emphasis, (i) if Tenant does not carry out all of Tenant's obligations under this Lease, Owner may keep all or part of the Security Deposit necessary to pay Owner for any losses incurred, including missed payments, and (ii) Owner's retention of the Security Deposit as allowable under this Lease shall not be deemed to be Owner's sole remedy for any default by Tenant of Tenant's obligations pursuant to the terms and conditions of this Lease.

TENANT ACKNOWLEDGES AND AGREES THAT THE SECURITY DEPOSIT CANNOT BE USED TOWARDS RENT OR ADDITIONAL RENT BY TENANT. Notwithstanding anything to the contrary contained in this Lease, if Owner shall apply all or any portion of the Security Deposit to cure a default of Tenant hereunder during the Term of this Lease, Tenant shall, within five (5) business days, deposit with Owner that sum which shall be necessary to maintain the security in an amount equal to the Security Deposit as so required in this Article 4. Failure to replenish the Security Deposit in a timely manner shall be deemed a default under this Lease.

If Owner sells the Premises, Owner, at its sole option, will turn over Tenant's security either to Tenant or to the person buying the Premises within five (5) days after the sale. Owner will then notify Tenant, by registered, certified or overnight mail by a nationally recognized overnight courier, of the name and address of the person or company to whom the deposit has been turned over. In such case, Owner will have no further responsibility to Tenant for the Security Deposit and the new owner will become responsible to Tenant for the Security Deposit.

### 5.   IF TENANT IS UNABLE TO MOVE IN

Except as otherwise provided herein, Owner shall not be liable for failure to give Tenant possession of the Premises on the Lease Commencement Date. Rent shall be payable as of the beginning of this Lease Term unless Owner is unable to give Tenant possession. A situation could arise which might prevent Owner from letting Tenant move into the Premises on he Lease Commencement Date. If his happens for reasons beyond Owner's reasonable control, Owner will not be responsible for Tenant's damages or expenses and this Lease will remain in effect. However, in such case, this Lease will start on the date when possession is available and the ending date of this Lease as specified in Article 2 will remain the same (unless otherwise mutually agreed to in writing by Tenant and Owner). Tenant will not have to pay Rent un il the date possession is available, or the date Tenant moves in, whichever is earlier (however, in no event shall Tenant move in or take possession prior to the date Owner shall have given Tenant notice that Tenant may take possession of he Premises). Owner will notify Tenant as to he date possession is available. If Owner does not give Tenant notice that possession is available within thirty (30) days after the Lease Commencement Date, provided that Owner's failure to deliver possession is not due to a Tenant delay, Tenant may send a fifteen (15) day written notice (the "Termination Notice") to Owner, and if Owner is unable to deliver possession within fifteen (15) days of receipt of Tenant's Termina ion Notice, this Lease shall terminate and be of no further force and effect and all prepaid Rent, the Security Deposit and any other fees paid by Tenant at the execution of this Lease shall be promptly returned to Tenant.

### 6.   CAPTIONS

In any dispute arising under this Lease, in the event of a conflict between the text and a caption, the text controls.

### 7.   WARRANTY OF HABITABILITY

A. All of the sections of this Lease are subject to the provisions of the Warranty of Habitability Law. Under that law, Owner agrees that the Premises are fit for human habitation and hat there will be no conditions which will be detrimental to life, health or safety.

B. Tenant will do nothing to interfere with or make more difficult Owner's efforts to provide Tenant with the required facilities and services. Any condition caused by Tenant's misconduct or the misconduct of Tenant Parties (as hereinafter defined) or anyone else under Tenant's direction or control shall not be a breach by Owner.

### 8.   CARE OF THE PREMISES; END OF LEASE-MOVING OUT

A. At all imes during he Term of this Lease, Tenant will take good care of the Premises and will not permit or do any damage to it, except for damage which occurs through ordinary wear and tear. Tenant shall, at Tenant's own cost and expense, make all repairs caused or occasioned by Tenant or Tenant's agents, contractors, invitees, licensees, guests, or servants (collectively hereinafter "Tenant Parties"). In addition, Tenant shall promptly notify Owner in writing upon the occurrence of any problem, malfunction or damage to the Premises. Tenant will move out on or before the ending date of this Lease and leave the Premises in good order and in the same condition as it was when Tenant first occupied it, except for ordinary wear and tear and damage caused by fire or other casualty through no fault of Tenant.

B. CLEANING. Tenant is required to use only non-abrasive cleaning agents in the Premises. Tenant is responsible for damage done by use of any improper cleaning agents.

C. If Tenant fails to maintain the Premises or make a needed repair or replacement as required hereunder, Owner may hire a professional and make such maintenance, repairs or replacements at Tenant's sole cost and expense. Owner's reasonable expense will be payable by Tenant to Owner as Additional Rent within ten (10) business days after Tenant receives a bill from Owner.

D. When this Lease ends, Tenant must remove all of Tenant's movable property. Tenant must also remove at Tenant's own expense, any wall covering, bookcases, cabinets, mirrors, painted murals or any other installation or attachment Tenant may have installed in the Premises, even if it was done with Owner's consent. Tenant must restore and repair to its original condition those portions of the Premises affected by those installations and removals. Tenant has not moved out until all persons, furniture and other property of Tenant is also out of the Premises. If Tenant's property remains in the Premises after this Lease ends, Owner may either treat Tenant as still in occupancy and charge Tenant for use, or may consider that Tenant has given up the Premises and any property remaining in the Premises. In this event, Owner may either discard he property or store it at Tenant's expense. Tenant agrees to pay Owner for all costs and expenses incurred in removing such property. The provisions of this article will continue to be in effect after the end of this Lease.

E. Except as provided for otherwise in Article 35 of this Lease, in the event that (i) Owner intends to offer to renew this Lease with a Rent increase equal to or greater than five (5%) percent above the then current Rent, or (ii) Owner does not intend to renew this Lease, Owner shall provide Tenant written notice as follows:

(i)   If Tenant has occupied the Premises for less than one (1) year and does not have a Lease Term of at least one (1) year, Owner shall provide at least thirty (30) days' no ice;

(ii)   If Tenant has occupied he Premises for more than one (1) year but less than two (2) years, or has a Lease Term of at least one (1) year but less than two (2) years, Owner shall provide at least sixty (60) days' notice; or

000375-03

**EXHIBIT E**

(iii) If Tenant has occupied the Premises for more than two (2) years or has a Lease Term of at least two (2) years, Owner shall provide at least ninety (90) days' notice.

F.  Within a reasonable time after notification of either party's intention to terminate  his Lease, unless Tenant provides less than two (2) weeks' notice of Tenant's intention to terminate, Owner shall notify Tenant in writing of Tenant's right to request an inspec ion before vacating the Premises. Tenant shall have the right to be present at said inspection. Subject to the foregoing, if Tenant requests such inspection, the inspection shall be made no earlier than two (2) weeks and no later than one (1) week before the end of the tenancy. Owner shall provide at least forty-eight (48) hours written notice of the date and  ime of the inspection. After the inspec ion, Owner shall provide Tenant with an itemized statement specifying repairs, cleaning or other deficiencies that are proposed to be the basis of any deductions from the Security Deposit. If Tenant requests such inspection, Tenant shall be given an opportunity to remedy identified deficiencies prior to the end of the tenancy (or, at Owner's sole option, if Tenant fails to remedy any such identified deficiencies, Owner may remedy such identified deficiencies at Tenant's sole cost and expense as described hereinafter).  Any and all repairs or alterations made to the Premises as a result of said inspection shall be at Tenant's sole cost and expense. Said repairs must be approved by Owner and shall be performed, at Owner's sole option, by (i) licensed and adequately insured Tenant's contractors in a good and skillful manner with materials of quality and appearance comparable to existing materials and approved by Owner or (ii) by Owner's contractor(s).

**9.   CHANGES AND ALTERATIONS TO PREMISES**

A.  Tenant cannot build in, add to, change or alter, the Premises in any way, including, but not limited to, installing, changing or altering any paneling, wallpaper, flooring, "built in" decorations, partitions, railings, paint, carpeting, plumbing, ventilating, air conditioning, electric or heating systems without first obtaining the prior written consent of Owner which may be withheld in Owner's sole discretion. Without Owner's prior written consent, Tenant cannot install, change or use in the Premises any of the following: dishwasher machines, clothes washing or drying machines, electric stoves, garbage disposal units, heating, ventilating or air conditioning units or any other electrical equipment which, in Owner's opinion, will overload the existing wiring installation in the Premises.  Also, Tenant cannot place in the Premises water-filled furniture.  If Owner's consent is given, the alterations and installations shall become the property of Owner when completed and paid for by Tenant. They shall remain with and as part of the Premises at the end of the Term. Notwithstanding the foregoing, Owner has the right to demand that Tenant remove the alterations and installations at the end of the Lease Term, and in such case Tenant shall repair all damage resulting from said removal and restore same to its original condition, including any holes in the wall or damage caused by the removal of any pictures, artwork or TV mounts hung by Tenant on the walls. Any and all work shall be performed by Tenant in accordance with the terms and conditions of this Lease and in accordance with all applicable laws, rules, regulations and codes of any governmental or quasi-governmental entity.  Tenant's contractor shall also supply, before performing any such work, a certificate of insurance naming Owner as additional insured.

B.  If a lien is filed on the Premises due to Tenant's fault, it must promptly pay or bond the amount stated in the lien. Owner may pay or bond the Lien if Tenant fails to do so within ten (10) days after Tenant has written notice about  he lien, in which case, Owner's costs shall be paid by Tenant as Additional Rent.

**10.  TENANT'S DUTY TO OBEY AND COMPLY WITH LAWS, REGULATIONS AND RULES**

A.  GOVERNMENT LAWS AND ORDERS.  Tenant will obey and comply: (i) with all present and future city, state and federal laws, rules regulations and codes of any governmental or quasi-governmental en ity or body which affect the Premises and (ii) with all orders and regulations of insurance rating organizations which affect  the Premises. Tenant will not allow any windows in  he Premises to be cleaned from the outside unless  he prior written consent of the Owner is obtained.

B.  OWNER'S RULES AFFECTING TENANT.  Tenant will obey all of the Owner's rules listed in this Lease and any attached rider and all future reasonable rules of Owner or Owner's agent.  No ice of all additional rules shall be delivered to Tenant in writing.

C.  TENANT'S RESPONSIBILITY.  Tenant is responsible for the behavior of Tenant, the Permitted Occupants of the Premises, the Tenant Parties and any other people who are visiting  he Premises. Tenant will reimburse Owner as Additional Rent upon demand for the cost of all losses, damages, fines and reasonable legal expenses incurred by Owner because Tenant, the Permitted Occupants of the Premises, or the Tenant Parties or any other people visiting the Premises have not obeyed applicable laws, rules, regulations and codes of any governmental or quasi-governmental entity, or this Lease.

**11.  OBJECTIONABLE CONDUCT**

Tenant, the Permitted Occupants of the Premises, the Tenant Parties and any other people visiting the Premises will not  engage in objectionable conduct at the Premises. Objectionable conduct ("Objectionable Conduct") means behavior which makes or will make the Premises less fit to live in for Tenant or  his or her occupants. It also means anything which interferes with the right of o hers to properly and peacefully enjoy the Premises, or causes conditions that are dangerous, hazardous, unsanitary and detrimental to occupants of the Premises. Objectionable Conduct by Tenant or the Tenant Parties and any other people visiting the Premises may be treated as a default under  his Lease and gives Owner the right to end this Lease on six (6) days written notice to Tenant that this Lease will end.

**12.  SERVICES AND FACILITIES**

A.  REQUIRED SERVICES.  The Owner will provide (i) cold and hot water and heat, as required by law; (ii) repairs to the Premises not caused by Tenant (subject to the terms and conditions of this Lease), the Tenant Parties or any other people visiting the Premises, and (iii) the utilities, if any, included in the Rent, as set forth in subparagraph B. Tenant is not entitled to any Rent reduction because of a stoppage or reduction of any of the above services unless it is provided by law.

B.  The following utilities are included in the Rent:   None_____ **[INSERT "NONE" IF NO UTILITIES ARE INCLUDED IN THE RENT]**

C.  ELECTRICITY AND OTHER UTILITIES.  Tenant acknowledges and understands that Owner has no obligation to supply, or liability in connection with, utilities or services in or to the Premises (except as may be provided for otherwise in this Lease).  Tenant shall be responsible, at Tenant's sole cost and expense, securing air conditioning, electricity, gas, cable, phone, snow removal, exterminating and all other utilities and services (including landscaping services).  Tenant shall contract directly with the appropriate utility provider for all aforementioned services (not including the utilities included in the Rent as provided for in subparagraph B). Tenant acknowledges and agrees that Tenant will, at Tenant's own cost and expense, remove all ice and snow from the sidewalk and driveway of  he Premises and comply with all municipal regulations therewith throughout the Term of this Lease. In the event Owner maintains service or maintenance contracts for the Premises, to  he extent such contracts affect the Premises during the Term of this Lease, Tenant shall pay such charges, and these charges will be billed as Addi ional Rent.

D.  Stopping or reducing of service(s) will not be reason for Tenant to stop paying Rent, to make a money claim or to claim eviction. Damage to the equipment or appliances supplied by Owner, caused by Tenant's acts, omissions or neglect, or the acts, omissions or neglect of the Tenant Parties or any other people visiting the Premises, shall be repaired at Tenant's sole cost and expense. In the event that Tenant fails to make such repairs within a reasonable period of time, Owner shall have the option to make such repairs at Tenant's expense and charge the same to Tenant as Additional Rent.  Damage to the equipment or appliances supplied by the Owner, which are not caused by Tenant's negligence, acts or misuse, or the negligence, acts or misuse of the Tenant Par ies or any other people visiting the Premises, shall be promptly repaired by the Owner at the Owner's sole cost and expense.  Owner may stop service of the plumbing, heating, air cooling or electrical systems, because of accident, emergency, repairs, or changes until the work is complete.

000376-03

3

## EXHIBIT E

Notwithstanding the foregoing, except in emergency situations, Owner shall provide Tenant no less than twenty-four (24) hours prior written notice of any planned service stoppages. Owner shall take all necessary steps to ensure that service stoppages do not interfere with Tenant's use and enjoyment of the Premises.

E. APPLIANCES. Appliances supplied by Owner in the Premises are for Tenant's use. They shall be in working order on the date hereof and will be maintained and repaired or replaced by Owner, except if repairs or replacement are made necessary because of Tenant's or the Tenant Parties' negligence or misuse, Tenant will pay Owner for the cost of such repair or replacement as Additional Rent. Notwithstanding anything to the contrary contained in this Lease, provided he appliance in need of repair has been delivered in working order on the Lease Commencement Date, Tenant shall be responsible for the initial $_____ in cost of such appliance's repair or replacement [*DELETE IF INAPPLICABLE OR INSERT AMOUNT*]. Tenant must not use a dishwasher, washing machine, dryer, freezer, heater, ventilator or o her appliance unless installed by Owner or with Owner's prior written consent (in its sole discretion). Tenant must not use more electric than the wiring or feeders to the Building can safely carry.

**13.  INABILITY TO PROVIDE SERVICES**

Because of a strike, labor, trouble, national emergency, repairs, or any o her cause beyond Owner's reasonable control, Owner may not be able to provide or may be delayed in providing any services or in making any repairs to the Premises.  In any of these events, any rights Tenant may have against Owner are only those rights  which are allowed by laws in effect when  he reduc ion in service occurs.

**14.  ENTRY TO PREMISES**

During reasonable hours and with reasonable no ice, except in emergencies, Owner, Owner's representatives, agents or employees may enter the Premises for the following reasons:

A. To erect, use and maintain pipes and conduits in and through the walls and ceilings of  he Premises; to inspect; exterminate; install or work on master antennas or other systems or equipment; and to perform other work and make any and all repairs, alterations or changes Owner decides are necessary.  Rent will not be reduced because of any of the foregoing work, unless required by law.

B. To show the Premises to potential buyers or lenders.

C. For ninety (90) days before  he end of  he Lease Term, to show the Premises to persons who wish to lease it.

D. If, during the last month of the Lease, Tenant has moved out and removed all or almost all of Tenant's property from the Premises, Owner may enter to make changes, repairs or redecorations. Tenant's Rent will not be reduced for that mon h and this Lease will not be ended by Owner's entry.

E. If, at any time, Tenant is not personally present to permit Owner, Owner's representatives or the agents and employees, to enter the Premises and entry is necessary or allowed by law, under this Lease, Owner, Owner's representatives or its agents and employees may nevertheless enter the Premises. Owner, Owner's representa ives or its agents and employees may enter by force in an emergency. Owner will not be responsible to Tenant, unless during this entry, any au horized party is negligent or misuses Tenant's property.

**15.  ASSIGNING; SUBLETTING; ABANDONMENT**

A.  Assigning and Subletting.  Tenant cannot assign this Lease or sublet all or part of the Premises or permit any other person to use the Premises (other than a Permitted Occupant) without the prior written consent of the Owner, which Tenant acknowledges may be withheld by Owner in its sole and absolute discre ion, for any reason or no reason.  If Tenant assigns this Lease or sublet all or part of the Premises and fail to obtain Owner's prior written consent, in addi ion to any and all other rights of Owner under this Lease and at law and/or in equity, Owner has the right to cancel the Lease.  Tenant must get Owner's written permission as provided for herein, each time Tenant wants to assign or sublet.  Permission to assign or sublet is good only for that assignment or sublease.  Tenant remains bound to the terms of this Lease after an assignment or sublet is permitted, even if Owner accepts money from the assignee or subtenant.  The amount accepted will be credited toward money due from Tenant, as Owner shall determine.  The assignee or subtenant does not become Owner's tenant.  Tenant is responsible for acts and neglect of any person in the Premises.  Notwithstanding the foregoing, Owner expressly reserves the right to terminate the Lease with respect to the Premises upon the receipt by Owner of any request for assignment or sublease ("Owner's Recapture Right").  Owner's Recapture Right, if exercised, must be sent to Tenant in writing within thirty (30) days after Tenant's request to assign or sublet the Premises.  In the event  hat Owner consents to an assignment and elects not to exercise Owner's Recapture Right, Tenant shall reimburse Owner for all of Owner's attorneys' fees in connection with the review of the assignment or sublease.  In the event that Owner agrees to an assignment or sublease, subject to applicable law, Owner shall be entitled to one hundred percent (100%) of any consideration or rent over and above that Rent provided for in this Lease.  The sublease shall provide that the subtenant shall, at Owner's op ion, attorn to Owner upon any termination of this Lease.

B.  Abandonment. If Tenant moves out of the Premises (abandonment) before the end of this Lease without the consent of Owner, this Lease will not be ended. Tenant will remain responsible for each monthly payment of Rent as it becomes due and Additional Rent until the end of this Lease.  In case of abandonment Tenant's responsibility for Rent and Additional Rent will end only if Owner chooses to end  his Lease for default as provided in Ar icle 16.

**16.  DEFAULT**

A.  Tenant defaults under the Lease if Tenant acts in any of the following ways:

(i)     Tenant fails to carry out any agreement or provision of this Lease;

(ii)    Tenant does not take possession or move into the Premises 15 days after the beginning of this Lease; or

(iii)   Tenant and the Permitted Occupants of the Premises move out permanen ly before this Lease ends.

If Tenant defaults in any one of these ways, other than a default in the agreement to pay Rent and/or Addi ional Rent, Owner may serve Tenant with a written notice to stop or correct the specified default within ten (10) days. Tenant must then either stop or correct the default within such ten (10) day period, or, if the nature of the default is not reasonably capable of being cured within such ten (10) day period, then Tenant must begin to take all steps necessary to correct the default within ten (10) days and thereafter diligently continue to do all that is necessary to correct the default as soon as possible (however, in no event shall any extension of the aforesaid ten (10) day period exceed thirty (30) days).

B.  If Tenant does not stop, correct or begin to materially correct a default within ten (10) days as provided for above, or engages in Objectionable Conduct, Owner shall give Tenant a written notice that this Lease will end six (6) days after the date such written notice is sent to Tenant. At the end of the six (6) day period, this Lease will end and Tenant then must move out of the Premises. Even though this Lease ends, Tenant will remain liable to Owner for unpaid Rent and/or Additional Rent up to the end of this Lease, damages caused to Owner after that time as stated in Article 17.

C.  If Owner does not receive the Rent and/or the Additional Rent wi hin five (5) days of when this Lease requires, Owner or Owner's agent shall send Tenant, via certified mail, a written notice stating the failure to receive such Rent and/or Additional Rent. Provided Owner has served Tenant with a fourteen (14) day written demand, and Owner does not receive the overdue Rent (and Additional Rent, as applicable) wi hin fourteen (14) days after such written fourteen (14) day demand for Rent (and Additional Rent, as applicable) has been made, Owner may commence an action or summary proceeding seeking the payment of all Rent and/or Additional Rent. If the Lease ends Owner may do  he following: (i) enter the Premises and retake possession of it if Tenant has moved out; (ii) go to court and ask that Tenant and all other occupants in the Premises be compelled to move out.

Once this Lease has been ended, whether because of default or otherwise, Tenant gives up any right Tenant might otherwise have to reinstate this Lease.

**17.  REMEDIES OF OWNER AND TENANT'S LIABILITY**

If this Lease is ended by Owner because of Tenant's default, the following are  he rights and obligations of Tenant and Owner:

A.  Tenant must pay Rent and Additional Rent until this Lease has ended. Thereafter, Tenant must pay an equal amount for what the law calls "use  and occupancy" until Tenant actually moves out.

B.  Once Tenant is out, Owner may re-rent the Premises or any portion of it for a period of time which may end before or after the

ending date of this Lease. Owner may re-rent to a new tenant at a lesser rent or may charge a higher rent than the Rent in this Lease. Notwithstanding the foregoing, if Tenant vacates the Premises in violation of the terms of this Lease, only then shall Owner use reasonable efforts to re-rent the Premises at the lesser of the fair market value of the Premises or the Rent paid hereunder.

C.  Whether the Premises is re-rented or not, Tenant must pay to Owner as damages:

(i)  the difference between the Rent in this Lease and the amount, if any, of the rents collected in any later lease of the Premises for what would have been the remaining period of this Lease; and

(ii)  Owner's expenses for the cost of getting Tenant out and re-renting  he Premises, including, but not limited to, putting the Premises in good condition, repairing damages, decorating and/or cleaning the Premises for re-rental, advertising the Premises and for real estate brokerage fees; and

(iii)  Owner's expenses for attorney's fees (except in  he event of a default judgment).

D.  Tenant shall pay all aforementioned damages due in monthly installments on the Rent day established in this Lease. Any legal action brought to collect one or more monthly installments of damages shall not prejudice in any way Owner's right to collect the damages for a later month by a similar action. If the rent collected by Owner from a subsequent tenant of the Premises is more  han the unpaid Rent and damages which Tenant owes Owner, Tenant cannot receive the difference. Owner's failure to re-rent to another tenant will not release or change Tenant's liability for damages.  Except as may be provided for otherwise in Article 17(B) of this Lease, Owner is not required to re-rent the Premises.

**18.  ADDITIONAL OWNER REMEDIES**

If Tenant does not do everything Tenant has agreed to do, or if Tenant does anything which shows that Tenant intends not to do what Tenant agreed to do, Owner has the right to ask a Court to make Tenant carry out Tenant's agreement or to give the Owner such other relief as the Court can provide. This is in addition to the remedies in Article 16 and 17 of this Lease.

**19.  FEES AND EXPENSES (INCLUDING BUT NOT LIMITED TO LEGAL FEES)**

A.  Tenant must reimburse Owner for any of the following fees and expenses incurred by Owner:

(i)  Making any repairs to the Premises, including any appliances in the Premises, which result from misuse, omissions or negligence by Tenant, the Permitted Occupants of the Premises, or the Tenant Parties or any other persons who visit the Premises;

(ii)  Correc ing any violations of city, state or federal laws or orders and regulations of insurance ra ing organization concerning the Premises which Tenant, the Permitted Occupants of the Premises, or the Tenant Parties or any other persons who visit  he Premises or work for Tenant have caused;

(iii)  Preparing the Premises for  he next tenant if Tenant moves out of the Premises before the Lease ending date without Owner's prior written consent;

(iv)  Any legal fees and disbursements for the preparation and service of legal notices; legal ac ions or proceedings brought by Owner against Tenant because of a default by Tenant under the Lease; or for defending lawsuits brought against Owner  because of the actions of Tenant, the Permitted Occupants of  he Premises, the Tenant Parties or any other persons who visit the Premises;

(v)  Removing any of Tenant's property from the Premises after this Lease is ended;

(vi)  Any miscellaneous charges payable to the Owner for services Tenant requested that  are not required to be furnished Tenant under this Lease for which Tenant has failed to pay the Owner and which Owner has paid;

(vii)  All other fees and expenses incurred by Owner because of the failure to obey any other provisions and agreements of this Lease by Tenant, the Permitted Occupants of the Premises, or the Tenant Parties or any o her persons who visit the Premises or work for Tenant.

B.  These fees and expenses shall be paid by Tenant to Owner as Additional Rent within ten (10) business days after Tenant receives Owner's bill or statement. If this Lease has ended when these fees and expenses are incurred, Tenant will s ill be liable to Owner for the same amount as damages.  In the event Tenant does not reimburse Owner within such ten (10) business day period, Owner shall be en itled to deduct the fees and expenses from the Security Deposit.

C.  Tenant has the right to collect reasonable legal fees and expenses incurred in a successful defense by Tenant of a lawsuit brought by Owner against Tenant or brought by Tenant against Owner to the extent provided by Real Property Law Section 234.

**20.  PROPERTY LOSS, DAMAGES OR INCONVENIENCE**

Tenant understands and agrees that unless caused by the gross negligence or willful misconduct of Owner, Owner's representatives or its agents and employees, none of these authorized parties are responsible to Tenant for any of the following: (i) any loss of or damage to Tenant or Tenant's property in the Premises due to any accidental or intentional cause, including a theft or another crime committed in the Premises.

Owner will not be liable for any temporary interference with light, ventilation, or view caused by construc ion. Owner will not be liable for any such interference on a permanent basis caused by construction on any parcel of land not owned by Owner. Owner will not be liable to Tenant for such interference caused by the permanent closing, darkening or blocking up of windows, if such action is required by law. None of the foregoing events will cause a suspension or reduction of the Rent or allow Tenant to cancel the Lease.

**21.  FIRE OR CASUALTY**

A.  Tenant shall give Owner immediate notice in case of fire or other damage to the Premises. If  he Premises become unusable, in part or totally, because of fire, accident or other casualty, this Lease will continue unless ended by Owner under subparagraph C below or by Tenant under subparagraph D below. However, the Rent will be reduced as of the date of the fire, accident or other casualty. This reduc ion will be based upon the square footage of the part of the Premises which is unusable, as determined by Owner.

B.  Owner will repair and restore the Premises, unless Owner decides to take actions described in subparagraph C below. For sake of clarity and emphasis, Owner is not required to repair or restore the Premises, or replace the furnishings, decorations or any of Tenant's property And furthermore (unless otherwise agreed to by Owner in writing), Owner shall not be responsible for any delays due to settling insurance claims, obtaining cost estimates, labor, material, equipment and/or supply problems, force majeure or for any other delay beyond Owner's reasonable control. If the Lease is cancelled, Owner need not restore the Premises.

C.  After a fire, accident or other casualty in the Premises, the Owner may decide to tear down the Premises or to substantially rebuild it. In such case, Owner need not restore the Premises but may end this Lease. Owner may do this even if the Premises has not been damaged, by giving Tenant written notice of this decision wi hin  he later of sixty (60) days after the date when the damage occurred or ten (10) business days after Owner is advised by its insurance carrier as to the amount of insurance proceeds it will have available to restore the Premises. If there is substantial damage to the Premises or if the Premises are completely unusable, Owner may cancel  his Lease by giving Tenant written notice of this decision within 30 days after the date when the damage occurred. If the Premises are unusable when Owner gives Tenant such notice, this Lease will end sixty (60) days from the last day of the calendar month in which Tenant was given notice.

D.  If the Premises is completely unusable because of fire, accident or other casualty and it is not repaired in thirty (30) days, Tenant may give Owner written notice that Tenant ends the Lease. If Tenant gives  hat notice, this Lease is considered ended on the day  hat the fire, accident or casualty occurred. Owner will promptly refund Tenant's Security Deposit and  he pro-rata portion of Rents (and Additional Rent, if applicable) paid for  he month in which the casualty happened.

E.  Unless prohibited by the applicable policies, to the extent that such insurance is collected, Tenant and Owner release and waive all right of recovery against the other or anyone claiming through or under each by way of subrogation.

F.  Tenant acknowledges that if fire, accident, or other casualty causes damage to any of Tenant's personal property in the Premises, including, but not limited to Tenant's furniture and clothes, the Owner will not be responsible to Tenant for the repair or replacement of any such damaged personal property unless such damage was as a result of the Owner's negligence.

000378-03

5

**EXHIBIT E**

**22.  PUBLIC TAKING**

The entire Premises or a part of it can be acquired (condemned) by any government or government agency for a public or quasi-public use or purpose. If this happens, this Lease shall end on the date the government or agency take title. Tenant shall have no claim against Owner for any damage resulting; Tenant also agrees that by signing this Lease, Tenant assigns to Owner any claim against the government or government agency for the value of the unexpired portion of this Lease.

**23.  SUBORDINATION, CERTIFICATES AND ACKNOWLEDGMENTS**

Notwithstanding any provisions to the contrary contained in this Lease, this Lease and Tenant's rights, are subject and subordinate to all present and future: (a) leases for the Premises or the land on which it stands, (b) Owner's mortgage(s) (now existing or hereinafter existing), (c) agreements securing money paid or to be paid by a lender, and (d) terms, conditions, renewals, changes of any kind and extensions of the mortgages, leases or lender agreements. If certain provisions of any such mortgage come into effect, the holder of any such mortgage can end this Lease and such parties may commence legal ac ion to evict Tenant from the Premises. If this happens, Tenant acknowledges that Tenant has no claim against Owner, or such mortgage holder. If Owner requests, Tenant will sign promptly any acknowledgment(s) of the "subordination" in the form that Owner may require. Tenant authorizes Owner to sign such acknowledgements(s) for Tenant if Tenant fails to do so within five (5) days of Owner's request.

Tenant also agrees to sign (if accurate) a written acknowledgment within ten (10) days of request to any third party designated by  Owner that this Lease is in effect, that Owner is performing Owner's obligations under this Lease and that Tenant has no present claim against Owner.

**24.  TENANT'S RIGHT TO LIVE IN AND USE THE PREMISES**

If Tenant pays the Rent and any required Additional Rent on time and Tenant does everything Tenant has agreed to do in this Lease, Tenant's tenancy cannot be cut off before the ending date, except as provided for o herwise in this Lease, including, but not limited to, in Articles 21, 22 and 23.

**25.   BILLS AND NOTICE; ELECTRONIC SIGNATURES**

Any notice, statement, demand or other communication required or permitted to be given rendered or made by either party to the other, pursuant to this Lease or pursuant to any applicable law or requirement of public authority, shall be in writing (whether or not so stated elsewhere in this Lease) and shall be given by registered or certified mail, return receipt requested, or by overnight mail by a nationally recognized overnight carrier [or via email] [*DELETE IF INAPPLICABLE*] addressed to each of the following parties:

An electronic signature on this Lease, rider or any renewal of Owner or Tenant shall be deemed an original document and a binding signature pursuant to  he Electronic Signatures and Records Act of the State Technology Law.

If to Owner:

_____
_____
_____
_____
_____

Email Address: _____                [*DELETE IF INAPPLICABLE*]

With a copy to:

_____
_____
_____
_____

Email Address: _____                [*DELETE IF INAPPLICABLE*]

If to Tenant: at Premises, subsequent to Commencement Date

Prior to Commencement Date:

_____
_____
_____
_____

A.     Notwithstanding anything to the contrary contained in this Lease, any notice from Owner or Owner's agent or attorney may be delivered to Tenant personally at the Premises. Notices shall be deemed received the next business day if by overnight carrier, the date of delivery if by personal delivery or three (3) business days after being mailed if by certified or registered mail.

**26.  GIVING UP RIGHT TO TRIAL BY JURY AND COUNTERCLAIM**

A.     Both Tenant and Owner agree to give up the right to a trial by jury in a court action, proceeding or counterclaim (excluding compulsory counterclaims) on any matters concerning this Lease, the relationship of Tenant and Owner as lessee and lessor or Tenant's use or occupancy of the Premises. This agreement to give up the right to a jury trial does not include claims or personal injury or property damage.

B.     If Owner begins any court action or proceeding against Tenant which asks that Tenant be compelled to move out, Tenant cannot make a counterclaim unless Tenant is claiming that Owner has not done what Owner is supposed to do about the condition of the Premises.

**27.  NO WAIVER OF LEASE PROVISIONS**

A.     Even if Owner accepts Tenant's Rent and/or Additional Rent or fails once or more often to take action against Tenant when it has not done what Tenant has agreed to do in this Lease the failure of Owner to take action or Owner's acceptance of Rent and/or Additional Rent does not prevent Owner from taking ac ion at a later date if Tenant does not do what Tenant has agreed to do herein.

B.     Only a written agreement between Tenant and Owner can waive any viola ion of this Lease.

C.     If Tenant pays and Owner accepts an amount less than all the Rent and/or Additional Rent due, the amount received shall be considered to be in payment of all or part of the earliest Rent and/or Additional Rent due. It will not be considered an agreement by Owner to accept this lesser amount in full satisfaction of all of the Rent and/or Additional Rent due unless  here is a written agreement between Tenant and Owner.

D.     Any agreement to end this Lease and also to end the rights and obligations of Tenant and Owner must be in writing, signed by Tenant and Owner or Owner's agent. Even if Tenant gives keys to the Premises and they are accepted by Owner's representative or  Owner, this Lease is notended.

**28.  CONDITION OF THE PREMISES; PREMISES RENTED "AS IS"**

By signing this Lease, Tenant acknowledges that Owner or Owner's representatives have not made any representations or promises with respect to the Premises except as herein expressly set forth.  After signing this Lease but before Tenant begins occupancy, Tenant shall have the opportunity to inspect the Premises with Owner or Owner's agent to determine the condition of the Premises. If Tenant requests such inspection, the parties shall execute a written agreement before Tenant begins occupancy of the Premises attesting

000379-03                                          6

**EXHIBIT E**

to the condition of the Premises and specifically noting any existing defects or damages. Before taking occupancy of the Premises, Tenant has inspected the Premises (or Tenant has waived such inspection) and accepts it in its present condition "as is", except for any condition which Tenant could not reasonably have seen during Tenant's inspecion. Tenant agrees that Owner has not promised to do any work in the Premises except as specified in Exhibit B annexed hereto (if any) and made apart hereof.

### 29. HOLDOVER

A.      At the end of the Term, Tenant shall: (i) return the Premises to the Owner in broom clean, vacant and in good condition, ordinary wear and tear excepted; (ii) remove all of Tenant's property and all of Tenant's installations, alterations and decorations (if so directed by Owner); and (iv) repair all damages to the Premises caused by moving; and restore the Premises to its condition at the beginning of the Term ordinary wear and tear excepted.

B.      Tenant hereby indemnifies and agrees to defend and hold Owner harmless from and against any loss, cost, liability, claim, damage, fine, penalty and expense (including reasonable attorneys' fees and disbursements but excluding consequential or punitive damages) resulting from delay by Tenant in surrendering the Premises upon the termination of this Lease, including any claims made by any succeeding tenant or prospective tenant or successor landlord founded upon such delay.

C.      If Tenant holds over possession after the expiration date of the Lease or earlier termination of the Lease term or any extended term of this Lease, such holding over shall not be deemed to extend the term of this Lease or renew this Lease.  Under no circumstances (i) will such holdover constitute a month-to-month tenancy, (ii) shall this Article 29 imply any right of Tenant to remain in the Premises after the expiration or earlier termination of this Lease, (iii) will Owner be prohibited from exercising any rights permitted by law against a holdover tenant; or (iv) will any monies paid by Tenant or accepted by Owner (e.g., Rent, Additional Rent, holdover rent or otherwise) after the expiration or earlier termination of this Lease be deemed to reinstate any form of tenancy between Tenant and Owner. In connection with such holdover, Tenant shall pay the following charges for the use and occupancy of the Premises for each calendar month or part thereof (even if such part shall be a small fraction of a calendar month), which total sum Tenant agrees to pay to Owner promptly upon demand, in full, without set-off or deduction:

(i)      TWO (2) times the highest monthly Rent set forth in this Lease, plus

(ii)     items of Additional Rent that would have been payable monthly pursuant to this Lease, had this Lease not expired or terminated.

The aforesaid provisions of this Article 29 shall survive the expiration or earlier termination of this Lease.

### 30. DEFINITIONS

A.      Owner: The term "Owner" means the person or organiza ion receiving or entitled to receive Rent from Tenant for the Premises at any par icular time other than a rent collector or managing agent of Owner. "Owner" is the person or organization that owns legal title to the Premises.  It does not include a former owner, even if the former owner signed this Lease.

B.      Tenant: The term "Tenant" means  he person or persons signing this Lease as lessee and the respective heirs, distributees, executors, administrators, successors and assigns of the signer. This Lease has established a lessor-lessee relationship between Owner and Tenant.

### 31. SUCCESSOR INTERESTS

The agreements in this Lease shall be binding on Owner and Tenant and on those who succeed to the interest of Owner or Tenant by law, by approved assignment or by transfer.

### 32. INSURANCE

A.      As a material inducement for Owner to enter into this Lease, Tenant shall obtain (i) liability insurance insuring Tenant, the Permitted Occupants of the Premises, the Tenant Parties and any o her people visiting the Premises, and (ii) personal property insurance insuring Tenant's furniture and furnishings and other items of personal property located in the Premises. Tenant may not maintain any insurance with respect to any furniture or furnishings belonging to Owner that are located in the Premises unless otherwise directed by Owner. Tenant acknowledges that Owner may not be required to maintain any insurance wi h respect to the Premises.

B.      Owner is not liable for loss, expense, or damage to any person or property, unless due to Owner's gross negligence or wrongful acts.  Owner is not liable to Tenant for permitting or refusing entry of anyone into  he Premises. Tenant must pay for damages suffered and reasonable expenses of Owner relating to any claim arising from any act, omission or neglect by Tenant. If an action is brought against Owner arising from Tenant's acts, omissions or neglect, Tenant shall defend Owner at Tenant's sole cost and expense with an attorney reasonably acceptable to Owner.  Tenant is responsible for all acts, omissions or neglect of the Tenant Parties.

C.      Tenant shall indemnify and save harmless Owner from and against any and all liability, penalties, losses, damages, expenses, suits and judgments arising from injury during the term of this Lease to person or property of any nature and also from any matter growing out of the occupation of the Premises, provided however that such is not the result of Owner's gross negligence or wrongful acts or that of Owner's employees, or agents. Tenant agrees, at Tenant's sole cost and expense to procure and maintain at all  imes during the Lease term the following insurance:

(i)      General Liability Insurance for an amount not less than _____ Dollars ($_____) with an umbrella policy of no less than _____ Dollars ($_____) [*DELETE IF INAPPLICABLE OR INSERT AMOUNTS*]; and

(ii)     Renters Insurance, which covers any, and all personal property or belongings contained in the Premises. Tenant agrees to hold Owner harmless regarding these personal belongings due to loss or damage except in cases of Owner's gross negligence.

D.      The aforementioned insurance policies shall name Owner and the property manager (if applicable) as addi ional insureds or interests, as applicable.  In the event of the Tenant's failure to procure and/or maintain the aforementioned policies prior to the date possession of the Premises is ready to be delivered to Tenant on the Lease Commencement Date, Owner may (i) refuse to deliver possession of the Premises to Tenant until such time as evidence of such insurance is delivered by Tenant to Owner (however, Tenant shall nonetheless remain responsible for the payment of Rent and Addi ional Rent as of  he Lease Commencement Date), and/or (ii) order such insurance policies, pay the premiums, and add the amount thereof to the Rent next coming due as Additional Rent, and the Owner shall have all rights and remedies for the collection thereof as is provided for the collec ion of ordinary Rent. The abovementioned insurance policies shall provide for no less than thirty (30) days' notice of cancellation or modifica ion to Owner, and Tenant shall provide Owner with a copy of such insurance policies. Evidence of the aforesaid coverage being in place shall be presented to the Owner on or before the first day of the term of this Lease and may be requested at any time during term of this Lease. Such insurance policies are to be written by a good and solvent company licensed to do business in the state of New York. Tenant shall immediately reimburse Owner for the cost of any insurance policy Owner obtains for the Premises, including but not limited to insurance for Owner's furniture or furnishings in the Premises. Tenant acknowledges that Owner may not be required to maintain any insurance with respect to the Premises.

### 34. BROKER [*DELETE EITHER SUBPARAGRAPH A OR B; IF SUBPARAGRAPH B IS DELETED, INSERT NAME OF*

# EXHIBIT E

BROKER(S) IN SUBPARAGRAPH A]

A.    Owner and Tenant represent that in the negotiation of this Lease they dealt with no broker(s) other than Ravi Kantha of Leslie J. Garfield     (the "Tenant's Broker") and  Ravi Kantha of Leslie J. Garfield     (the "Owner's Broker") (hereinafter collectively referred to as the "Broker"). Such Broker(s) will be compensated by [Tenant]
                                          n accordance with a separate agreement subject to a fully executed and delivered lease.

C.    Owner and Tenant hereby agree to indemnify, defend and hold harmless each other from and against any and all claims, demands, liabilities, suits, losses, costs and expenses (including reasonable attorneys' fees and disbursements) arising out of any inaccuracy or alleged inaccuracy of the above representation. Owner shall have no liability for any brokerage commissions arising out of a sublease or assignment by Tenant. The provisions of this Article 34 shall survive the expiration or sooner termination of this Lease.

36. **TERRACES, BALCONIES AND BACKYARDS** *[DELETE IF INAPPLICABLE]*
     A.    All of the terms and conditions of this Lease apply to the terrace, balcony or backyard (as applicable). Tenant's use of the terrace, balcony or backyard must comply with any rules that may be provided to Tenant by Owner.
     B.    Tenant shall clean the terrace or balcony (and/or, if applicable, the backyard) and keep the terrace or balcony (and/or, if applicable, the backyard) free from snow, ice, garbage and other debris. No cooking is allowed on the terrace or balcony (and/or, if applicable, the backyard) except as may be otherwise permitted by law. Tenant may not install a fence or any addition on the terrace or balcony (and/or, if applicable, the backyard). Tenant is responsible for making all repairs to the terrace or balcony (and/or, if applicable, the backyard) if caused by Tenant, the Tenant Parties or any other visitor to the Premises, at Tenant's sole expense.

38. **PETS** *[DELETE EITHER SUBPARAGRAPH A OR B; IF SUBPARAGRAPH A IS DELETED, INSERT NECESSARY INFORMATION IN SUBPARAGRAPH B]*
     A.    Tenant may not keep any pets in the Premises. IF TENANT BREACHES THIS SECTION, TENANT WILL FORFEIT TWENTY PERCENT (20%) OF THE SECURITY DEPOSIT TO THE OWNER, TO COMPENSATE OWNER FOR ANY AND ALL COSTS RELATING THERETO AS LIQUIDATED DAMAGES (AND NOT AS A PENALTY). TENANT ACKNOWLEDGES AND AGREES THAT THE FOREGOING IS A MATERIAL INDUCEMENT FOR OWNER TO ENTER INTO THIS LEASE, AND BUT FOR SAID COVENANT, OWNER WOULD NOT HAVE EXECUTED THIS LEASE AGREEMENT

39. **SMOKING**
     THERE IS NO SMOKING PERMITTED INSIDE THE PREMISES UNDER ANY CIRCUMSTANCES. IF TENANT DISREGARDS THIS AGREEMENT, TENANT WILL FORFEIT TWENTY PERCENT (20%) OF THE SECURITY DEPOSIT TO THE OWNER, TO COMPENSATE OWNER FOR ANY AND ALL COSTS RELATING THERETO AS LIQUIDATED DAMAGES (AND NOT AS A PENALTY). TENANT ACKNOWLEDGES AND AGREES THAT THE FOREGOING IS A MATERIAL INDUCEMENT FOR OWNER TO ENTER INTO THIS LEASE, AND BUT FOR SAID COVENANT, OWNER WOULD NOT HAVE EXECUTED THIS LEASE AGREEMENT.

40. **KEYS/SECURITY**
     A.    Tenant shall not remove, alter, or change in any way the existing locks, security codes or keys that are provided for the Premises or any part thereof. Tenant assumes liability for any person keys are entrusted to. The name, address and telephone number of any person with an additional set of keys to the Premises are required to be furnished to Owner. Only Owner may make such additional sets of keys upon Tenant's written request with the abovementioned information. Owner will not refuse any such reasonable request. All extra sets of keys must be returned to Owner no later than 1 day prior to move out unless agreed to by Owner. In the event that all keys are not returned to the Owner by or before the last day of tenancy, Tenant agrees to pay for the replacement cost as mentioned below (or part thereof if Owner deems it appropriate).
     B.    Tenant agrees and understands that Tenant will be charged a re-keying fee in the sum of $350 00 for the entrance door each and every time a key replacement is required or deemed necessary by Owner if the need arises due to Tenant's loss of the key, employee changes, or request. Said charges shall be deemed Additional Rent.
     C.    Owner shall retain keys to all locks of the Premises. If Tenant makes any changes to any such lock, Tenant must deliver keys to Owner, or its managing agent. At the end of this Lease, Tenant must deliver to Owner all keys to the Premises. If Tenant fails to return any keys, Tenant shall pay Owner the cost of replacing any such keys.
41. **WALL, CABINET AND OTHER ATTACHMENTS**
     Tenant shall not nail, screw or otherwise affix anything of whatever kind or nature into or onto any part of Premises without prior written consent from Owner except when hanging pictures or accessories on walls only. Notwithstanding the foregoing, all walls shall be returned to Owner in their original condition as of the Lease Commencement Date. No nails, screws or glued attachments may be used on moldings, windows, window frames, doors, counter tops or cabinets.
42. **GARBAGE, REFUSE AND RECYCLING**
     Tenant shall comply with the New York City garbage and recycling laws. Tenant must place garbage in prescribed areas only using correctly colored garbage containers. Tenant shall not place any large articles outside of the Premises except in safe places and in compliance with NYC Sanitation and Fire Code Laws. Tenant agrees to promptly pay Owner for Sanitation violations concerning Tenant's obligations pursuant to this Article 42 as Additional Rent should Tenant cause Owner to receive such violations. Tenant may also choose to respond to a violation to avoid payment to Owner, but must show favorable ruling of or payment to the court to avoid paying Owner for such violations.
43. **WINDOW GUARDS**
     Simultaneously with the execution of this Lease, Tenant shall complete and deliver to Owner a notice with respect to the installation of window guards in the Premises in the form required by the City of New York annexed as a rider attached to this Lease. Tenant acknowledges that it is a violation of law to refuse, interfere with installation, or remove window guards where required.
44. **BED BUG DISCLOSURE**
     Tenant and Owner shall sign and complete the disclosure of bedbug infestation history annexed as a rider attached to this Lease.
45. **SPRINKLER DISCLOSURE**
000381-03

**EXHIBIT E**

Tenant and Owner shall sign and complete the sprinkler disclosure annexed as a rider attached to this Lease.

**46.  OCCUPANCY NOTICE FOR INDOOR ALLERGEN HAZARDS**

Owner shall complete and deliver to Tenant the Occupancy Notice for Indoor Allergen Hazards annexed as a rider attached to this Lease. Owner acknowledges that it has delivered to Tenant "What Every Tenant Should Know About Indoor Allergens" and Tenant acknowledges receipt of such notice.

**47.  STOVE KNOB COVERS**

Simultaneously with the execution of this Lease, Tenant shall complete and deliver to Owner the Annual Notice for Tenants in Multiple Dwelling Units with gas-powered stoves annexed as a rider attached to this Lease.

**48.  NO SHORT TERM RENTAL**

Under no circumstances shall Tenant put a listing for the Premises on Airbnb or for other similar short term rental (i.e., a rental for less than thirty (30) days), or use the Premises for same.  If Tenant does so, Owner has the right to immediately terminate this Lease.

TENANT ACKNOWLEDGES AND AGREES THAT THE FOREGOING IS A MATERIAL INDUCEMENT FOR OWNER TO ENTER INTO THIS LEASE, AND BUT FOR SAID COVENANT, OWNER WOULD NOT HAVE EXECUTED THIS LEASE AGREEMENT.  IF TENANT DISREGARDS THIS AGREEMENT, IN ADDITION TO THE RIGHT OF INJUNCTION, THE RIGHT TO TERMINATE THIS LEASE ON SIX (6) DAYS' WRITTEN NOTICE TO TENANT AND ANY AND ALL REMEDIES AVAILABLE UNDER THIS LEASE AND AT LAW OR EQUITY, TENANT WILL FORFEIT THE ENTIRE SECURITY DEPOSIT TO THE OWNER, TO COMPENSATE OWNER FOR ANY AND ALL COSTS RELATING THERETO AS LIQUIDATED DAMAGES (AND NOT AS A PENALTY).  TENANT SHALL ALSO BE RESPONSIBLE FOR ANY AND ALL FINES AND PENALTIES IMPOSED BY ANY GOVERNMENTAL OR QUASI-GOVERNMENTAL AGENCY OR BODY.

**49.  INDEMNIFICATION**

Tenant shall indemnify and save harmless Owner and Owner's agents, and, at Owner's op ion, defend Owner and Owner's agents against and from any and all claims against Owner and Owner's agents arising wholly or in part from any act, omission or negligence of Tenant or the Tenant Parties.  This indemnity and hold harmless agreement shall include indemnity from and against any and all liability, fines, suits, demands, costs, damages and expenses of any kind or nature (including without limitation attorney's and other professional fees and disbursements) incurred in or in connection with any such claims (including any settlement thereof) or proceeding brought thereon, and the defense thereof.

**50.  NOISE**

Tenant shall not create any unreasonable noise levels which shall interfere with the quiet enjoyment of the neighbors of the Premises.  Tenant agrees to promptly no ify Owner in writing of all noise complaints or summons which Tenant receives in writing, and to submit a proposal reasonably satisfactory to Owner as to how to handle same and assure that such complaints shall not recur. TENANT ACKNOWLEDGES AND AGREES THAT THE FOREGOING IS A MATERIAL INDUCEMENT FOR OWNER TO ENTER INTO THIS LEASE, AND BUT FOR SAID COVENANT, OWNER WOULD NOT HAVE EXECUTED THIS LEASE AGREEMENT.  IF TENANT DISREGARDS THIS AGREEMENT, IN ADDITION TO THE RIGHT OF INJUNCTION AND ANY AND ALL REMEDIES AVAILABLE UNDER THIS LEASE AND AT LAW OR EQUITY, TENANT WILL FORFEIT THE ENTIRE SECURITY DEPOSIT TO THE OWNER, TO COMPENSATE OWNER FOR ANY AND ALL COSTS RELATING THERETO AS LIQUIDATED DAMAGES (AND NOT AS A PENALTY).

**51.  WAIVER OF LIABILITY**

Anything contained in this Lease to the contrary notwithstanding, Tenant agrees that Tenant shall look solely to the estate and property of Owner in the Premises or to any proceeds obtained by Owner as a result of a sale by Owner of the Premises, for the collection of any judgment (or other judicial process) requiring the payment of money by Owner in the event of any default or breach by Owner with respect to any of the terms and provisions of this Lease to be observed and/or performed by Owner, subject, however, to the prior rights of any lessor under a superior lease or holder of a superior mortgage. No other assets of Owner or any partner, officer, director or principal of Owner, shall be subject to levy, execution or other judicial process for the satisfac ion of Tenant's claim hereunder.

**52.  OWNER'S APPROVAL**

If Tenant shall request Owner's approval or consent and Owner shall fail or refuse to give such approval or consent, Tenant shall not be entitled to any damages for any withholding or delay of such approval or consent by Owner, it being intended that Tenant's sole remedy shall be an action for injunction without bond or specific performance (the rights to money damages or other remedies being hereby specifically waived). Furthermore, such remedy shall be available only in those cases where Owner shall have expressly agreed in writing not to unreasonably withhold its consent or approval (as applicable), or where as a matter of law, Owner may not unreasonably wi hhold its consent or approval.  In such event, provided Tenant is successful therein, Owner shall be responsible to pay Tenant's actual costs and expenses incurred therein, including reasonable attorneys' fees.

**53.  BANKRUPTCY; INSOLVENCY**

If (i) Tenant files a voluntary petition in bankruptcy or insolvency or are the subject of an involuntary bankruptcy proceeding, (ii) Tenant assigns property for the benefit of creditors, or (iii) a non-bankruptcy trustee or receiver of Tenant's or Tenant's property is appointed, Owner may give Tenant thirty (30) days' notice of cancellation of the Term of this Lease. If any of the above is not fully dismissed within the thirty (30) day period, the Term shall end as of the date stated in the notice. Tenant must continue to pay Rent and Addi ional Rent and any damages, losses and expenses due Owner without offset.

**54.  CONTROLLING LAW**

Tenant acknowledges that by negotiating and entering into this Lease, Tenant has transacted business within the State of New York. Any action, proceeding or claim arising out of  his Lease or breach  hereof, shall be li igated within the State of New York and the parties consent to the personal jurisdiction of the courts (including the New York City Housing Court) within the State of New York and consent that any process may be served either personally, by facsimile or by certified or registered mail, return receipt requested, to Tenant at Tenant's address as set forth in this Lease, or in any manner provided by New York Law.

Tenant shall not be entitled, directly or indirectly, to diploma ic or sovereign immunity and shall be subject to, and Tenant shall agree to consent to, the service of process in, and the jurisdiction of  he courts of, New York State.

**55.  OWNER'S CONTROL**

The Lease shall not end or be modified nor will Tenant's obligations be ended or modified if for any cause not fully within Owner's reasonable control, Owner is delayed or unable to (a) fulfill any of Owner's promises or agreements, or (b) supply any required service or (c) make any required repairs to the Premises.

**56.  COUNTERPARTS**

This Lease may be executed in any number of identical counterparts and by scanned or facsimile signature, and each counterpart hereof shall be deemed to be an original instrument, but all counterparts hereof taken together shall constitute but a single instrument.

**57.  BINDING EFFECT**

It is expressly understood and agreed that this Lease shall not constitute an offer or create any rights in Tenant's favor, and shall in no way obligate or be binding upon Owner, and this Lease shall have no force or effect un il this Lease is duly executed by Tenant and Owner and a fully executed copy of this Lease is delivered to both Tenant and Owner.

**58.  TOILETS/PLUMBING FIXTURES**

The toilets and plumbing fixtures shall only be used for the purposes for which they were designed or built for. No feminine hygiene or similar products such as paper towels may be discarded in the toilets or plumbing fixtures.

**59.  EMERGENCIES**

Tenant will provide Owner with list of persons to contact in the event of an emergency. Emergencies include, but are not limited to: heal h and safety of Tenant or Tenant Parties, water damage or fire, or unauthorized persons attempting entry into the Premises

without Owner's knowledge.

**60. BICYCLES [*DELETE IF INAPPLICABLE*]**

All bicycles are expressly forbidden in the Premises.

**61. ALARM SYSTEM [*DELETE IF INAPPLICABLE*]**

Tenant hereby acknowledges and agrees that the Premises comes equipped with an alarm system (the "Alarm System") which must be turned on each and every time that Tenant leaves the Premises unoccupied for an extended period of time. Owner shall deliver codes to Tenant to the Alarm System prior to Lease commencement.  Tenant acknowledges that Tenant shall not change the Alarm System codes under any circumstances without the prior written consent of Owner. Tenant acknowledges and agrees that the foregoing is a material inducement for Owner to enter into this Lease, and but for said covenant, Owner would not have executed this Lease. Notwithstanding the presence of the Alarm System in the Premises, Tenant hereby acknowledges and agrees that Owner will not be responsible for any loss or lost or stolen personal property, equipment, money or any article taken from the Premises regardless of how or when such loss occurs.

**62. THIRD PARTY BENEFICIARY**

This Lease is an agreement solely for the benefit of Owner and Tenant (and their permitted successors and/or assigns).  No person, party or entity other than Owner and Tenant shall have any rights hereunder or be entitled to rely upon the terms, covenants and provisions contained herein.  The provisions of this Article 62 shall survive the termination hereof.

**63. MOVING IN, VACATING PREMISES AND TERMINATION**

A.  Should Owner become concerned with the inadequate care and/or supervision of Tenant's moving company's crew, Tenant shall instruct moving personnel to comply with Owner's reasonable request for added protection throughout the Premises. All moving personnel must be fully insured and reasonable proof of such insurance must be supplied to Owner before moving will be permitted on or in  he Premises.

B.  In the course of Tenant's moving in, out or having items delivered to the Premises, should there be any damage to the halls, doors or any other part of the Premises, Tenant shall be responsible to pay for the repair of such damage.

C. Upon the expiration of this Lease, Tenant shall return the Premises in broom clean condition. Additional cleaning charges incurred by Owner due to Tenant's breach of this Article 63 shall be borne by Tenant and shall be deemed Additional Rent.

**64. OWNER UNABLE TO PERFORM**

Notwithstanding anything to the contrary contained in this Lease, any prevention, delay or stoppage due to strikes, lockouts, labor disputes, acts of God, inability to obtain services, labor, or materials or reasonable substitutes therefore, governmental actions, civil commotion, fire or other casualty, and other causes beyond the reasonable control of the party obligated to perform, except with respect to the obligations imposed with regard to the payment of Rent and Additional Rent to be paid by Tenant pursuant to this Lease (any of the foregoing "Force Majeure") shall excuse the performance of such party for a period equal to any such prevention, delay or stoppage.

**65. ILLEGALITY**

If a term in this Lease is illegal, invalid or unenforceable, the rest of this Lease remains in full force.

**SIGNATURES CONTINUED ON NEXT PAGE**

# EXHIBIT E

TO CONFIRM OUR AGREEMENTS, OWNER AND TENANT RESPECTIVELY SIGN THIS LEASE AS OF THE DAY AND YEAR FIRST WRITTEN ON PAGE 1.

Witnesses

_____      _____ (L.S.)
                                                                  Owner's Signature

_____      _____ (L.S.)
                                                                  Tenant's Signature

_____      _____ (L.S.)
                                                                  Tenant's Signature

## GUARANTY

*[FOR USE WHEN TENANT (A) IS A CORPORATION OR LIMITED LIABILITY COMPANY AND A PERSONAL GUARANTY WILL BE REQUIRED BY THE OWNER, OR (B) OWNER REQUIRES A GUARANTOR OF TENANT'S LEASE OBLIGATIONS]*

The undersigned Guarantor [or Guarantors (hereinafter collectively referred to as "Guarantor")] guarantees to Owner the strict performance of and observance by Lessee of all the agreements, provisions and rules in the attached Lease. Guarantor agrees to waive all notices when Lessee is not paying Rent and/or Additional Rent or not observing and complying with all of the provisions of the attached Lease. Guarantor agrees to be equally liable with Lessee so that Owner may sue Guarantor directly without first suing Lessee. The Guarantor further agrees that this guaranty shall remain in full effect even if the Lease is renewed changed or extended in any way and even if Owner has to make a claim against Guarantor. Owner and Guarantor agree to waive trial by jury in any such action, proceeding or counterclaim brought against the other on any matters concerning the attached Lease or the Guaranty.  Guarantor will pay reasonable attorneys' fees, court costs and other expenses incurred by Owner in enforcing or attempting to enforce this Guaranty. This Guaranty shall be binding upon the Guarantor and shall inure to the benefit of the Owner, and their respective heirs, distributees, executors, administrators, successors and assigns. The Guarantors shall be jointly and severally liable under this Guaranty.

Guarantor further agrees that if Tenant becomes insolvent or shall be adjudicated a bankrupt or shall file for reorganization or similar relief or if such petition is filed by creditors of Tenant, under any present or future Federal or State law, Guarantor's obligations hereunder may nevertheless be enforced against the Guarantor.  The termination of the Lease pursuant to the exercise of any rights of a trustee or receiver in any of the foregoing proceedings, shall not affect Guarantor's obligation hereunder or create in Guarantor any setoff against such obligation.  Neither Guarantor's obligation under  his Guaranty nor any remedy for enforcement thereof, shall be impaired, modified or limited in any manner whatsoever by any impairment, modification, waiver or discharge resulting from the operation of any present or future operation of any present or future provision under the National Bankruptcy Act or any other statute or decision of any court.  Guarantor further agrees that its liability under this Guaranty shall be primary and that in any right of action which may accrue to Owner under the Lease, Owner may, at its option, proceed against Guarantor and Tenant, or may proceed against either Guarantor or Tenant without having commenced any action against or having obtained any judgment against Tenant or Guarantor.

Dated_____

_____ Guarantor
Name:

_____ Address

STATE OF NEW YORK          )
                                                  ) ss.:
COUNTY OF                             )

On the ____ day of _____ in the year _____, before me, the undersigned, a Notary Public in and said State of New York, _____ personally appeared, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

_____ Guarantor
Name:

_____ Address

STATE OF NEW YORK          )
                                                  ) ss.:
COUNTY OF                             )

On the ____ day of _____ in the year _____, before me, the undersigned, a Notary Public in and said State of New York, _____ personally appeared, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

000384-03

**EXHIBIT E**

**Exhibit A**

**MEMORANDUM CONFIRMING TERM**

*[DELETE IF INAPPLICABLE]*

THIS MEMORANDUM ("Memorandum") is made as of __August__ __12__ , __2020__ between 314 Hicks LLC _____, ("Owner") and ████████████ Moffitt ("Tenant"), pursuant to that certain Lease Agreement between Owner and Tenant dated as of __August__ __12__, __2020__ (the "Lease") for the Premises located at _314 Hicks Street, Brooklyn, NY 11201_ (the "Premises"), and more particularly described in the Lease.  All initial-capitalized terms used in this Memorandum have the meanings ascribed to them in the Lease.

1)    Owner and Tenant hereby confirm that:

   (a)    The Lease Commencement Date of the Lease Term is _9/1/2020_ ___, _____;
   (b)    The expiration date of the Lease Term is _5/31/2021_ ___, _____; and
   (c)    The date Rent commences under the Lease is _9/1/2020_ ___, _____.

2)    Tenant hereby confirms that:

   (a)    All commitments, arrangements or understandings made to induce Tenant to enter into the Lease have been satisfied;
   (b)    The condition of the Premises complies with Owner's obligations under the Lease; and
   (c)    Tenant has accepted and is in full and complete possession of the Premises.

3)    This Memorandum shall be binding upon and inure to the benefit of the parties and their permitted successors and assigns.

IN WITNESS WHEREOF, the parties have executed this Memorandum as of the date first set forth above.

**OWNER:**

By: _____
    Name:

**TENANT:**

By: _____
    Name:

By: _____
    Name:

**EXHIBIT E**

**Exhibit B**

**OWNER'S WORK**

*[DELETE IF INAPPLICABLE]*

Owner shall perform the following work in the Premises prior to the Lease Commencement Date.

**EXHIBIT E**

Exhibit C

## PREMISES FURNITURE

**[*DELETE IF INAPPLICABLE*]**

The following is a list of Owner's furniture and furnishings remaining in the Premises:

**EXHIBIT E**

Use with Real Estate Board Single Family/Townhouse Lease
new or renewal
REB 7/19

**RIDER**

*[DELETE IF THE BUILDING WAS ERECTED AFTER 1978]*
**DISCLOSURE OF INFORMATION ON LEAD-BASED PAINT
AND/OR LEAD-BASED  PAINT HAZARDS**

LEAD WARNING STATEMENT

Housing built before 1978 may contain lead-based paint. Lead from paint, paint chips, and dust can pose health hazards if not managed properly. Lead exposure is especially harmful to young children and pregnant women. Before renting pre-1978 housing, lessors must disclose the presence of known lead-based paint and/or lead-based paint hazards in the dwelling. Lessees must also receive a federally approved pamphlet on lead poisoning prevention.

LESSOR'S  DISCLOSURE
(a)     Presence of  lead-based paint and/or lead-based  paint hazards (Check (i) or (ii) below);
(i) _____Known lead-based paint and/or lead-based paint hazards are present in the housing  (Explain):

(ii) ✓ _____Lessor has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.

(b)     Records and reports available to the lessor   (Check (i) or (ii)  below:
(i) _____Lessor has provided the lessee with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in  the housing (list documents  below).

(ii) ✓ _____Lessor has  no reports  or  records pertaining  to  lead-based  paint  and/or lead-based paint hazards in the  housing.

Lessee's  Acknowledgment (initial)
(c) _____Lessee has received copies of all information  listed  above.
(d) _____Lessee has received the pamphlet, ***Protect Your Family from Lead in Your Home.***

Agent's Acknowledgment (initial)
(e) ✓ _____Agent has informed the lessor of the lessor's obligations under 42 U.S.C. 4852d and is aware of his/ her responsibility to  ensure compliance.

Certification  of Accuracy
The following parties have reviewed the information above and certify to the best of their knowledge that the information they have provided is true and  accurate.

314 Hicks LLC
Lessor

_____  _____
Signature                              Date

██████████ Moffitt
Lessee

_____  _____
Signature                              Date

**EXHIBIT E**



# WINDOW GUARDS REQUIRED
### Lease Notice to Tenant

**New York City Department of Health and Mental Hygiene**

**You are required by law to have window guards installed in all windows if a child 10 years of age or younger lives in your apartment.**

Your landlord is required by law to install window guards in your apartment: if a child 10 years of age or younger lives in your apartment,

OR

if you ask him to install window guards at any time (you need not give a reason).

It is a violation of law to refuse, interfere with installation, or remove window guards where required.

## CHECK ONE

☐ **CHILDREN 10 YEARS OF AGE OR YOUNGER LIVE IN MY APARTMENT**

☐ **NO CHILDREN 10 YEARS OF AGE OR YOUNGER LIVE IN MY APARTMENT**

☐ **I WANT WINDOW GUARDS EVEN THOUGH I HAVE NO CHILDREN 10 YEARS OF AGE OR YOUNGER**

███████████████ Moffitt
Tenant (Print)

_____     _____
Tenant's Signature                                                    Date

314 Hicks Street, Brooklyn, NY 11201
Tenant's Address                                                        Apt No.

## RETURN THIS FORM TO:

314 Hicks LLC
Owner/Manager

314 Hicks Street, Brooklyn, NY 11201
Owner/Manager's Address

### *For Further Information call 311 for Window Falls Prevention*

WF-013 (Rev. 11/2018)
000389-03

EXHIBIT E

**RIDER**

| |
|---|
| **NOTICE TO TENANT** |
| <u>**DISCLOSURE OF BEDBUG INFESTATION HISTORY**</u> |

Pursuant to the NYC Housing Maintenance Code, an owner/managing agent of residential rental property shall furnish to each tenant signing a vacancy lease a notice that sets forth the property's bedbug infestation history.

Name of tenant(s): ███████████████ Moffitt

Building:        314 Hicks Street, Brooklyn, NY 11201

Apt. #:

Date of vacancy lease:

<div align="center">

**BEDBUG INFESTATION HISTORY**

(Only boxes checked apply)

</div>

[☑] There is no history of any bedbug infestation within the past year in the building or in any apartment.

[ ] During the past year the building had a bedbug infestation history that has been the subject of eradication measures. The location of the infestation was on the _____ floor(s).

[ ] During the past year the building had a bedbug infestation history on the _____ floor(s) and it has not been the subject of eradication measures.

[ ] During the past year the apartment had a bedbug infestation history and eradication measures were employed.

[ ] During the past year the apartment had a bedbug infestation history and eradication measures were not employed.

[ ] Other: _____ .

Signature of Tenant(s): _____ Dated: _____

Signature of Owner/Agent: _____ Dated: _____

DBB-N  (DHCR 10/10)

**EXHIBIT E**

## SPRINKLER DISCLOSURE

Pursuant to the New York State Real Property Law, Article 7, Section 231-a, effective December 3, 2014 all residential leases must contain a conspicuous notice as to the existence or non-existence of a Sprinkler System in the Leased Premises.

Name of tenant(s):                          ████████████ Moffitt _____

Lease Premises Address:      314 Hicks Street, Brooklyn, NY 11201 _____

Apartment Number:           _____(the "Leased Premises")

Date of Lease:              9/1/2020 _____

CHECK ONE:

    1. [  ]  There is <u>NO</u> Maintained and Operative Sprinkler System in the Leased Premises.

    2. [✓]  There is a Maintained and Operative Sprinkler System in the Leased Premises.

        A.  The last date on which the Sprinkler System was maintained and inspected was on_____.

A **"Sprinkler System"** is a system of piping and appurtenances designed and installed in accordance with generally accepted standards so that heat from a fire will automatically cause water to be discharged over the fire area to extinguish it or prevent its further spread (Executive Law of New York, Article 6-C, Section 155-a(5)).

**Acknowledgment & Signatures:**
I, the Tenant,  have read the disclosure set forth above.  I understand that this notice, as to the existence or non-existence of a Sprinkler System is being provided to me to help me make an informed decision about the Leased Premises in accordance with New York State Real Property Law Article 7, Section 231-a.

Tenant :      Name:        ████████████ Moff
              Signature:   _____    Date  _____

              Name:        _____
              Signature:   _____    Date: _____

Owner         Name:        314 Hicks LLC _____
              Signature    _____    Date  _____

000391-03

## RIDER

## OCCUPANCY NOTICE FOR INDOOR ALLERGEN HAZARDS

I.The owner of the building located at 314 Hicks Street, Brooklyn, NY 1120 is required, under New York

City Administrative Code section 27-2017.1 et seq., to make an annual inspection for indoor allergen

hazards (such as mold, mice, rats, and cockroaches) in your apartment and the common areas of the

building. The owner must also inspect if you inform him or her that there is a condition in your

apartment that is likely to cause an indoor allergen hazard, or you request an inspection, or the City of

New York Department of Housing Preservation and Development has issued a violation requiring

correction of an indoor allergen hazard for your apartment. If there is an indoor allergen hazard in your

apartment, the owner is required to fix it, using the safe work practices that are provided in the law. The

owner must also provide new tenants with a pamphlet containing information about indoor allergen

hazards.

2. The owner is also required, prior to your occupancy as a new tenant, to fix all

visible mold and pest infestations in the apartment, as well as any underlying defects, like leaks,

using the safe work practices provided in the law. If the owner provides carpeting or furniture,

he or she must thoroughly clean and vacuum it prior to occupancy. This notice must be signed

by the owner or his or her representative, and state that he or she has complied with these

requirements.

I, 314 Hicks LLC _____(owner or representative name in print), certify that I

have complied with the requirements of the New York City Administrative Code section 27-

2017.5 by removing all visible mold and pest infestations and any underlying defects, and where

applicable, cleaning and vacuuming any carpeting and furniture that I have provided to the

tenant. I have performed the required work using the safe work practices provided in the law.


_____          _____
            Signature                          Date

**EXHIBIT E
RIDER**

# STOVE KNOB COVERS

## ANNUAL NOTICE FOR TENANTS IN MULTIPLE DWELLING UNITS WITH GAS-POWERED STOVES

Annual Notice For Tenants in Multiple Dwelling Units with gas-powered stoves
(Does Not Apply To Cooperatives and Condominiums)

The owner of the building located at ___314 Hicks Street, Brooklyn, NY 11201___ is required, by Administrative Code §27-2046.4(a), to provide stove knob covers for each knob located on the front of each gas-powered stove to tenants in each dwelling unit in which a child under six years of age resides, unless there is no available stove knob cover that is compatible with the knobs on the stove. Tenants may refuse stove knob covers by marking the appropriate box on this form. Tenants may also request stove knob covers even if they do not have a child under age six residing with them, by marking the appropriate box on this form. The owner must make the stove knob covers available within 30 days of this notice. Please also note that an owner is only required to provide replacement stove knob covers twice within any one-year period. You may request or refuse stove knob covers by checking the appropriate box on the form below, and by returning it to the owner at the address provided. If you do not refuse stove knob covers in writing, the owner will attempt to make them available to you.

_____

TENANT:

Please complete this form by checking the appropriate box, filling out the information requested, and signing.

Please return the form to the owner at the address provided by_____

Yes, I want stove knob covers or replacement stove knob covers for my stove, and I have a child under age six residing in my apartment.

Yes, I want stove knob covers or replacement stove knob covers for my stove, even though I do not have a child under age six residing in my apartment.

No, I DO NOT want stove knob covers for my stove, even though I have a child under age six residing in my apartment.

No, I DO NOT want stove knob covers for my stove. There is no child under age six residing in my apartment.

Print Name, Address, and Apartment Number:

(Tenant Signature)          (DATE)

▮▮▮▮▮ Moff

314 Hicks Street, Brooklyn, NY 11201

Return this form to: (Owner address)
314 Hicks Street, Brooklyn, NY 11201

**EXHIBIT E**

| | |
|---|---|
| **From:** | Olympia De Castro |
| **To:** | Gustavo Hernandez |
| **Subject:** | Fwd: Edited Rider for your review before sending out |
| **Date:** | Tuesday, August 18, 2020 6:25:04 PM |

---

---------- Forwarded message ---------
From: **Ravi Kantha** <RK@lesliegarfield.com>
Date: Tue, Aug 18, 2020 at 6:24 PM
Subject: Re: Edited Rider for your review before sending out
To: Olympia De Castro <olympia.decastro@gmail.com>


You're right - I can make the edits in 30 min if you'd like. Let me know.

On Tue, Aug 18, 2020 at 6:22 PM Olympia De Castro <olympia.decastro@gmail.com> wrote:
Ravi - you sure this is the correct rider? It shows the insurance at 500k for example. This
looks like edits on the original rider, not the last version we circulated.

I'll pull in these new edits you made to the latest version of the rider and send back to you.

On Tue, Aug 18, 2020 at 5:37 PM Ravi Kantha <RK@lesliegarfield.com> wrote:
Attached - minor changes. I included a redlined and clean copy. Good to send out
for signature?

The only issue in the lease is the $5,000 for appliances. They feel that's high. Are
you firm on that? LMK

Thanks!

**Ravi Kantha**
Partner
Director of Brooklyn Sales

_____



505 Park Avenue, Suite 303
New York, NY 10022
DIRECT 212.574.6979
OFFICE 212.371.8200
CELL 914.224.2191

**The Lesser Kantha Team**
#8 Brokerage Team in New York State 2017
#45 Brokerage Team in U.S. 2017

INSTAGRAM | LINKEDIN | TWITTER

lesliegarfield.com/agents/garfield/ravi-kantha



EXHIBIT E

All information furnished herein is deemed reliable and is submitted subject to errors, omissions, change of terms and conditions, and prior sale, rental or withdrawal without notice. We do not represent or guarantee the accuracy of any information and are not liable for any reliance thereon. The information contained in this electronic message is confidential. If the reader of this message is not the intended recipient, you are hereby notified that any use or distribution or reproduction of this communication is prohibited.  If you have received this communication in error, please delete the email from your computer and immediately notify us by email.

--

Olympia A. De Castro
M 917 █████████
olympia.decastro@gmail.com

--
Ravi Kantha
Partner
Director of Brooklyn Sales

_____

Inline image

505 Park Avenue, Suite 303
New York, NY 10022
DIRECT 212.574.6979
OFFICE  212.371.8200
CELL  914.224.2191

The Lesser Kantha Team
#8 Brokerage Team in New York State 2017
#45 Brokerage Team in U.S. 2017
lesliegarfield.com/agents/garfield/ravi-kantha

All information furnished herein is deemed reliable and is submitted subject to errors, omissions, change of terms and conditions, and prior sale, rental or withdrawal without notice. We do not represent or guarantee the accuracy of any information and are not liable for any reliance thereon. The information contained in this electronic message is confidential. If the reader of this message is not the intended recipient, you are hereby notified that any use or distribution or reproduction of this communication is prohibited.  If you have received this communication in error, please delete the email from your computer and immediately notify us by email.

--

_____

001297-03

**EXHIBIT E**

Olympia A. De Castro
M 917 █████████
olympia.decastro@gmail.com

**EXHIBIT E**

| | |
|---|---|
| **From:** | Olympia De Castro |
| **To:** | Gustavo Hernandez |
| **Subject:** | Fwd: 314 Hicks First Month |
| **Date:** | Monday, September 28, 2020 7:26:53 AM |

---

Begin forwarded message:

**From:** "Moffitt, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Date:** September 27, 2020 at 11:41:54 PM EDT
**To:** Olympia De Castro <olympia.decastro@gmail.com>
**Cc:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Subject: 314 Hicks First Month**

Olympia:

Hope you and your family remain well as we head into the Fall!

Thankfully, we were finally able to rectify initial the boiler / hot water issues on 9/17 and then schedule the follow up maintenance to address the heat before the cold comes. However, this caused significant inconvenience for the 10 days post notification and while I have some thoughts on what might be equitable, feel it would be best to discuss live. Please let me know when might work?

There are several other issues we wanted to bring to your attention and agree on how you'd like to handle, recognizing some are more pressing than others:

- <!--[if !supportLists]-->-   <!--[endif]-->In addition to the previously noted regular maintenance, there is an increasingly serious leak in the fridge that's spilling out onto the floor when opened. I'm happy to source a certified vendor if you don't have one, but feel best to address this as soon as feasible?
- <!--[if !supportLists]-->-   <!--[endif]-->The Viking vent hood above the stove is not working and can result in significant smoke backup in the kitchen during normal cooking usage.
- <!--[if !supportLists]-->-   <!--[endif]-->The Miele dishwasher is not draining properly, and has water backup post use (despite cleaning out the drain).
- <!--[if !supportLists]-->-   <!--[endif]-->As previously mentioned to Ravi when he came to make key copies, the new lock on the backdoor is quite tight and should probably be adjusted by the locksmith. Further, the screen on the backdoor is both ripped and has a broken bottom hinge. I'll see if Rey can address, but both were pre-existing.
- <!--[if !supportLists]-->-   <!--[endif]-->There is an issue with the back gate to the yard where it won't stay closed unless you shut it off. Not sure if there's a preferred vendor for this, or I should ask Rey for thoughts on how to address?
- <!--[if !supportLists]-->-   <!--[endif]-->There appears to be some issues with the outlets on the parlor and master floors. We're hopeful that this can be fixed with some new fuses, but wanted to inquire if you had a preferred electrician for consistency in case of more substantive wiring issues?
- <!--[if !supportLists]-->-   <!--[endif]-->More as a post, but we spent quite a bit of



GOVERNMENT EXHIBIT 22

money re-networking the house given the existing configuration. We can make it
work for now, but you'll likely need to rewire at least a portion (given lack of multiple
CAT feeds) so happy to provide some insight if/when helpful?
<!--[if !supportLists]-->-   <!--[endif]-->Lastly, probably just a result of big city
living, but the family has had three rodent encounters in both the back yard and
under the stoop. Thankfully just outdoors to date, but we've contacted an
exterminator to set box traps.

Let me know when you have a window to connect this week.

All the best,

▮

---

**From:** Olympia De Castro [mailto:olympia.decastro@gmail.com]
**Sent:** Tuesday, September 15, 2020 12:04 AM
**To:** Moffitt▮
**Cc:** ▮
**Subject:** Re: 314H - Welcome

Hi 

I'm happy to hear you're settling in well.

As you know the house is for all purposes new, since shortly after the initial
owners renovated it they put it in the market, and I haven't even seen it after
buying it!

And yes new houses are never without glitches, so yes please do feel free to
reach out directly for any issue and happy to address.

Sorry to hear about the lack of hot water. As soon as I was alerted, I engaged
the plumber and paid an extra fee to ensure this was resolved promptly. I
reached out to the plumber today and he explained the delay was due to the
fact they received the wrong part, but he assured me the new part would
arrive tomorrow and he would resolve asap. I will follow up to ensure this gets
done.

Regarding the ice maker, we'll contact Sub-zero and send a technician to
service it. This is surprising since the house just underwent a thorough
inspection for the closing, and the report confirmed all the appliances were
fully functional. But again it is not a problem.

On the TV controls, I understand every time you connect a new system it needs
to be programmed. I was not intending on using those but if you wish to do so,
please feel free to program them according to your preferences.

Separately, I hope the windows were cleaned to your satisfaction, as well as the
garden maintenance and the paint job.

**EXHIBIT E**

As for the new keys, no worries I'll ask Ravi to please arrange to pick these up.
BTW he mentioned he also resolved for the garage clicker.

My best, ODC

On Sep 14, 2020, at 6:42 PM, Moffitt, ███████████████████
wrote:

Hi Olympia:

Hope you're well and enjoyed the weekend!

We're doing our best to settle in, get rid of all the boxes and find
some routine. The house is lovely and has so many wonderful
attributes, and we look forward to a good year all things considered.

I did however want to bring a few items to your attention directly. First
as we approach mid-month, we still don't have any hot water and the
plumber doesn't yet have the part / hasn't promised a fix date. We
recognize that this was a surprise to all of us and you're doing your
best to address, but it's really been a challenge with small children
and we can't use facilities @work/Equinox/etc. given CoVID. Second,
I've contacted the old A/V company, and am trying to get him back to
the house, but even after installing all the new Spectrum equipment,
the TV controls need to be reprogrammed and the WiFi doesn't
extend past the Garden level. I'll let you know what they say, but
hopefully low maintenance and can eventually save you a step.
Third, the fridge doesn't make ice and is flashing a service signal.
Would you like us to reach out to Pro-line first, or find a Sub-Zero
specific vendor?

On another related note, pls let me know where you'd like us to send
the new house keys, as I don't believe we have a physical address?

We really want to have a positive relationship, so perhaps we can
speak live this week around your thoughts and what might be
equitable?

Thanks,

████

**From:** Olympia De Castro
[mailto:olympia.decastro@gmail.com]
**Sent:** Monday, August 31, 2020 11:15 PM
**To:** Moffitt, ███████████████
**Cc:** ████████████████
**Subject:** Re: 314H - Welcome

Thank you ████

That sounds great. Let's find a time once things have

EXHIBIT E

settled with the move.

Best, Olympia

On Mon, Aug 31, 2020 at 11:39 AM Moffitt, ███████ ███████████████████ wrote:

Greetings Olympia:

Thanks for your warm welcome. You have a lovely home and we're pleased to be sharing it for even a short window!

It's such a small world on so many fronts - perhaps we can all compare notes on the platforms respective growth and the FinTech space at some point?

I'm sure we'll have some follow ups / clarifications, but will endeavor to be light touch.

Nice to be connected and speak soon,

████

---

From: Olympia De Castro
<olympia.decastro@gmail.com>
Sent: Monday, August 31, 2020 10:56:56 AM
To: ███████████████ Moffitt, ████████
Subject: Re: 314H - Welcome

with corrected email address...

On Mon, Aug 31, 2020 at 10:46 AM Olympia De Castro <olympia.decastro@gmail.com> wrote:

A brief line to welcome you and your family to 314 Hicks.

████ I just realized we met last year when you and your colleague ███████████████ ████ to the Gratitude Railroad Board. I believe it was Sara Weinheiner who brought the opportunity. I am similarly a strong advocate for more women led funds. Hope things have been progressing well!

████ similarly I believe we may both have spoken at a Lendit conference the same year. Back then I was running a debt fund deploying via fintechs. Small world.

**EXHIBIT E**

Thrilled to have you both at 314H. Please feel
free to reach out with any questions. Ravi shared
with me a list and is preparing the response. I can
fill in the gaps as that comes through.

Hope you enjoy the home!

All the best, Olympia

--
_____

Olympia A. De Castro
M 917 ▮▮▮▮
olympia.decastro@gmail.com

--
_____

Olympia A. De Castro
M 917 ▮▮ ▮▮
olympia.decastro@gmail.com

See the http://www.gs.com/disclaimer/afg/ for important information
regarding this message and your reliance on information contained in it.
This message may contain information that is confidential or privileged. If
you are not the intended recipient, please advise the sender immediately
and delete this message. See the http://www.gs.com/disclaimer/email/ for
further information on confidentiality and the risks inherent in electronic
communication.

Your Personal Data: We may collect and process information about you that
may be subject to data protection laws. For more information about how we
use and disclose your personal data, how we protect your information, our
legal basis to use your information, your rights and who you can contact,
please refer to: www.gs.com/privacy-notices

--
_____

Olympia A. De Castro
M 917 ▮▮▮▮
olympia.decastro@gmail.com

See the http://www.gs.com/disclaimer/afg/ for important information regarding this
message and your reliance on information contained in it. This message may contain
information that is confidential or privileged. If you are not the intended recipient, please
advise the sender immediately and delete this message. See the
http://www.gs.com/disclaimer/email/ for further information on confidentiality and the risks

**EXHIBIT E**

inherent in electronic communication.

Your Personal Data: We may collect and process information about you that may be subject to data protection laws. For more information about how we use and disclose your personal data, how we protect your information, our legal basis to use your information, your rights and who you can contact, please refer to: www.gs.com/privacy-notices

See the http://www.gs.com/disclaimer/afg/ for important information regarding this message and your reliance on information contained in it. This message may contain information that is confidential or privileged. If you are not the intended recipient, please advise the sender immediately and delete this message. See the http://www.gs.com/disclaimer/email/ for further information on confidentiality and the risks inherent in electronic communication.

Your Personal Data: We may collect and process information about you that may be subject to data protection laws. For more information about how we use and disclose your personal data, how we protect your information, our legal basis to use your information, your rights and who you can contact, please refer to: www.gs.com/privacy-notices

001293-03

**EXHIBIT E**

PURCHASER'S RIDER TO CONTRACT OF SALE Dated May            , 2020
Between 314 Hicks Residence Trust by Edwin Jager, Trustee, as Seller
and DC 2019 Irrevocable Trust by Allison Domeneghetti, Trustee, as Purchaser
Premises:   314 Hicks Street, Brooklyn, New York

1.      In the event of any conflict or inconsistency between the provisions of this Purchaser's Rider and those set forth in the printed portion of the Contract to which this Rider is annexed or the Seller's Rider, the provisions of this Purchaser's Rider shall govern and be binding.

2.      Supplementing and modifying paragraph 16 of the printed form of this Contract, the roof and basement shall be free of leaks, seepage and/or standing water at closing. Further, Seller shall have the items listed on the annexed Schelte A repaired prior to closing as well as the additional items set forth in the Gotham City Home Inspections Inc. report with proof thereof provided to the Purchaser at or prior to the Closing.

3.      At or prior to Closing, Seller architect shall provide plans/permits for outdoor rooftop and the Seller shall provide:
-   full set of plans, including. MEP etc. (copies submitted to DOB for approvals)
-   alarm/camera: details (software/app) and permit copies
-   contact person who set-up/wired IT (Sonos, Lutron, etc.)
-   contact person who does the maintenance on mechanicals, a/c, boiler, dumbwaiter, gardening, garage door, etc.
-   contact person who does sidewalk clean-up
-   garden lighting details: possible to connect to lighting system?

4.      At closing, Seller shall deliver to Purchaser and shall assign by written instrument to Purchaser Seller's right to any roof bonds, and guaranties and warranties Seller may have regarding the property and/or appliances and fixtures contained therein.

5.      Seller represents and warrants that:

a.      Seller has not been adjudicated a bankrupt and he has no actual knowledge of any unsatisfied liens and/or judgments against him.

b.      Seller has not been known by any other name for the past ten years;

c.      Seller is the sole owner of the Property and has sole right, power and authority to sell, convey and transfer the same in accordance with the terms of this Contract.

d.      No actions, suits or proceedings have been instituted and are pending against Seller nor has Seller received written notice of any threatened action or proceeding by any party claiming a right of possession use, occupancy or ownership of the Premises;

e.      No action, suits or proceedings relative to the Premises of any nature whatsoever have



GOVERNMENT EXHIBIT 23

000369-03

**EXHIBIT E**

been instituted and/or are pending against Seller, nor has Seller received written notice of any threatened action or proceeding before any federal, state, municipal or government court, department, commission, board, bureau, agency or instrumentality;

f.       Seller has not entered into any contract for the sale of the Premises to any party other than Purchaser pursuant to this Contract and no party, other than Purchaser as provided hereunder, has any right or claim to purchase all or part of the Premises from Seller;

g.       Seller has no knowledge of the existence of any asbestos-containing material or the existence of any lead in the Premises;

h.       Seller has not requested or applied for, and shall not request or apply for between the date hereof and the Closing, any alteration permit, building permit or demolition permit or other approval of any government or quasi-governmental authority having jurisdiction over the Premises; and

i.       The Premises have direct and legal access to a public and legally opened street and there are no underground oil tanks on the property.

j.       There is a proper water meter installed on the premises, as required by law.

k.       The obligation of Purchaser to purchase the Premises is conditioned upon the truth and accuracy of all of the aforesaid representations and warranties of Seller.

l.       In addition to delivering good title, Seller represents and warrants that the premises is in compliance with all applicable laws, rules, regulations, ordinances, code requirements, and the like.

j.       Seller represents that all renovations, rehabilitations, structures, improvements, extensions and additions, as presently exist, are legal and have been completed in conformance with applicable codes, governmental regulations and all necessary permits, sign offs, work orders, certificates of completion, and/or certificates of occupancy have been obtained.  In the event it is determined that the foregoing representation is incorrect, Seller shall, at his sole cost and expense, either legalize such structures, improvements or additions and/or obtain all required signoffs and Letters of Completion or have same removed.  If the closing is delayed as a result, Seller shall pay any fees incurred by Purchaser as a result or Purchaser shall have the right to cancel this Contract and have the Down payment promptly returned.  At closing, there shall be no open or non-signed off permits or work orders or the like against the Premises. It shall be a condition of Purchaser's obligations to close under this Contract that any open permits filed with the New York City Department of Buildings shall have been signed off.

6..       Each party shall execute, acknowledge and deliver to the other party such documents as may be reasonably requested in order to comply with IRC§ 6045 (e), insofar as the same requires reporting of information with respect to real estate transactions. The parties designate the Seller as the attorney responsible for reporting the information as required by law pursuant to IRC§ 6045 (e). The provision of this paragraph shall survive closing.

**EXHIBIT E**

7.      Supplementing paragraph 16 of the printed portion of the Contract of Sale, Seller represents and warrants that there is no damage (other than reasonable wear and tear) to any part of the premises which is covered, hidden, concealed or which it was impracticable for Purchaser to view or inspect prior to the date hereof.  In the event such revealed prior to Closing, Seller agrees to repair same prior to Closing or establish a reasonable allowance or credit to Purchaser at closing or a reasonable escrow to cover the cost or necessary repair or replacement.  Seller represents that the flooring will be delivered at the time of closing free of defects.

8.      Seller represents that all renovations, rehabilitations, structures, improvements, extensions and additions, as presently exist, are legal and have been completed in conformance with applicable codes, governmental regulations and all necessary permits, sign offs, work orders, certificates of completion, and/or certificates of occupancy have been obtained.  In the event it is determined that the foregoing representation is incorrect, Seller shall, at his sole cost and expense, either legalize such structures, improvements or additions and/or obtain all required signoffs and Letters of Completion or have same removed.  If the closing is delayed as a result, Seller shall pay any fees incurred by Purchaser as a result or Purchaser shall have the right to cancel this Contract and have the Down payment promptly returned. At closing, there shall be no open or non-signed off permits or work orders or the like against the Premises. It shall be a condition of Purchaser's obligations to close under this Contract that any open permits filed with the New York City Department of Buildings shall have been signed off.

9.      If there are any inconsistencies between the printed portion of the contract and the standard form jointly prepared by the Real Property Section of the New York Bar Association, the New York Land Title Association, the Committee on Real Property Law of the Association of the Bar of the City of New York and the Committee on Real Property Law of the New York County Lawyers' Association, (11/00) the terms of the standard form shall control.

10.     Supplementing paragraph 10 of the printed form of Contract and in addition thereto, prior to Closing, Seller have the open elevator violations dismissed of record.

11.     The respective attorneys for the parties hereto shall have the right to extend any period of time herein so long as same shall be in writing in accordance with the terms of notice of this Contract.

12.     Seller shall pay the New York City Real Property Transfer Tax and the New York State Transfer tax and Purchaser shall pay the "Mansion Tax" at Closing and each party responsible for paying the tax shall hold the other free, harmless and indemnified of and from same, including reasonable attorney's fees and disbursements. This paragraph shall survive Closing.

13.     Any errors or omissions in computing closing adjustments at the time of closing shall thereafter be corrected.  Further, any unintentional misstatements of funds due following closing, including but not limited to common charges, real estate taxes, shall be corrected and Purchaser or Seller shall thereafter be responsible for those corrected amounts.  This paragraph shall survive closing for one (1) year.

000371-03

**EXHIBIT E**

14.     Seller shall repair any damage resulting from the removal of personal property from the Premises (except minor holes resulting from the removal of wall decorations/paintings/mirrors) and shall replace any lighting fixtures that are permitted to be removed from the Premises in accordance with the Contract, with standard lighting fixtures.

15.     If either party brings an action or legal proceeding for damages or arising out of an alleged breach of this Contract, then the prevailing party in any such action or proceeding shall also be entitled to recover from the other party as part of such action or proceeding or in any separate action brought for that purpose, such prevailing party's reasonable attorney's fees and costs. This paragraph shall survive Closing or the earlier termination (cancelation of this Contract).

**SIGNATURE PAGE OF RIDER FOLLOWS**

**SIGNATURE PAGE OF RIDER**

000372-03

**EXHIBIT E**

SELLER:

_____

PURCHASER:

_____

000373-03

**EXHIBIT E**

## STOCK POWER

The undersigned, Gustavo Hernandez, acting in his individual capacity, hereby sells, assigns and transfers to _____, _____ shares of common stock, no par value, of Global Securities Management, Corp., a British Virgin Islands corporation (the "Company"), represented by Stock Certificate No. 3, and hereby irrevocably constitutes and appoints _____ as attorney-in-fact to transfer such shares on the books of the Company with full power of substitution in the premises.

Dated as of _____

_____
Gustavo Hernandez

GOVERNMENT
EXHIBIT
24

001068-03

**EXHIBIT E**

 Gmail

Olympia De Castro <olympia.decastro@gmail.com>

---

## RE: 3 Gramercy

Gustavo Hernandez <ghernandez@gsadvisors.net>                                  Wed, Apr 10, 2019 at 2:43 PM
To: abbie cutter ██████████████████, "Bowman Cutter ████████████████"
████████████████, Gert-Jan van den Bergh ████████████ "Richard McCabe
████████ Olympia de Castro <olympia.decastro@gmail.com>

Hi all,

I just want to call your attention that the past 3 invoices Steve submitted add up to another $43,000 in legal fees.

All these invoices are related to the sale of Gerry's unit, not the arbitration.

While hopefully we get reimbursed all or at least part of these invoices, it is only fair we try to keep costs within reason.

Let's keep in mind that in addition to Steve's invoices, Gerry will have to pay for real estate counsel, Bonnie or other. And on top of this, per Steve, the house has to engage separate tax counsel to review any fiscal exposure the house could have with this sale, which again Gerry will have to pay.

To keep costs down, I suggest we consider for the house to engage one law firm that can take care of both the review of the sales contract and any tax matter for the house, and that ideally can work with a cap on fees.

Obviously tax matters are particular, and I understand Bonnie's firm is small but other NY law firms can address both.

The Corcoran folks can refer us to law firms they work with regularly.

If the other firms we converse with quote a higher number than what Bonnie and the firm Steve works with presented, then at least we show we made our best effort.

Thoughts?

From: Lydia Vieth [mailto:lvieth@andersonochs.com] On Behalf Of Steven Anderson
Sent: Wednesday, April 10, 2019 1:17 PM
To: abbie cutter ████████████████ Bowman Cutter ███████████
█████ Gert-Jan van den Bergh ████████████ █████ Gustavo Hernandez <ghernandez@gsadvisors.net>;
Olympia DeCastro (Olympia.decastro@mac.com) <Olympia.decastro@mac.com>; Richard McCabe
Cc: Steven Anderson <sanderson@andersonochs.com>
Subject: 3 Gramercy

April Invoice.  Also let me know if I have go ahead on tax counsel.

---

Anderson & Ochs, LLP
61 Broadway Suite 525
New York, NY 10006
212-344-3600 Tel
212-344-0970 Fax
www.andersonochs.com

This message, together with its attachments, if any, may contain information that is legally privileged and/or confidential, and is intended only for the use of the individual or entity to which it is addressed. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this message, or of its contents, or any attachments, is strictly prohibited. If you have received this message in error, please notify the original sender immediately by return e-mail or by telephone (212-344-3600) and delete the message, along with any attachments thereto, from your computer. Thank you.

GOVERNMENT
EXHIBIT
25

ODC001900



**EXHIBIT E**

Olympia De Castro <olympia.decastro@gmail.com>

---

## Fw: 3 GPW #2 ~ First Open House ~ Sunday 12-1:30

**abbie cutter** ▉▉▉▉▉▉▉▉▉                                    Fri, Apr 12, 2019 at 3:59 PM
To: Gert-Jan Van Den Bergh ▉▉▉▉, Bo Cutter ▉▉▉▉▉▉▉▉, Richard McCabe
▉▉▉▉▉, Gustavo Hernandez <ghernandez@gsadvisors.net>, Olympia de Castro
<olympia.decastro@gmail.com>, Corinne Van Den Bergh ▉▉▉▉▉▉

FYI--see the attractive email blast at the bottom here.  Abbie

----- Forwarded Message -----
**From:** abbie cutter ▉▉▉▉▉▉▉▉
**To:** Kolbusz, Paul <ptk@corcoran.com>; Melissa Sargeantson <melissa.sargeantson@corcoran.com>
**Sent:** Friday, April 12, 2019, 3:57:19 PM EDT
**Subject:** Re: 3 GPW #2 ~ First Open House ~ Sunday 12-1:30

Thanks, Paul.  It looks gorgeous.  Thanks for sharing this--I'll forward it on to the rest of the co-op.

Most important thing:  I'm assuming that you've spoken to Judy VDS about Sunday's open house. I've emailed her, but she never responds.

The front gate isn't yet repaired--it's more complicated that the ironworkers thought.  New pieces have to be made.  It's been off for almost a year because the work on the first floor renovation required it for getting lumber in and out.  But it needed a repair just about the time that started.  We couldn't do anything about it until the renovation was completed.  It may be several weeks until it's back in place.

The hall way is in the process of being repainted.  the two upper floors for our unit should be done by this weekend.  The painters are working their way down.  The carpet guy from ABC is coming Monday to measure.  We are replacing the red with a deep blue, same texture and pile depth.  New entry rug coming too.  The hall should be finished by this coming mid-week.  New carpet in 3 weeks.

I'm so sorry all of this isn't ready to go by Sunday.  We've been limited by when the mess on the first floor would be over.  They're now to tiny details and should be done this next week.

Thanks for all that you are doing for us.

Best, Abbie

On Friday, April 12, 2019, 2:44:38 PM EDT, Kolbusz, Paul <ptk@corcoran.com> wrote:


Hi Abbie

I just wanted to send you our email blasts for the open house.

Best

Paul Kolbusz
The Gelbard-Kolbusz Team
C: 646.641.0210
ptk@corcoran.com

Sent from my iPhone

Begin forwarded message:

> **From:** Paul Kolbusz <PTK@corcoran.com>
> **Date:** April 12, 2019 at 2:32:43 PM EDT
> **To:** <ptk@corcoran.com>



GOVERNMENT
EXHIBIT
26

ODC001644

**Subject: 3 GPW #2 ~ First Open House ~ Sunday 12-1:30**
**Reply-To:** Paul Kolbusz <PTK@corcoran.com>



## The Gelbard-Kolbusz Team

---

### OPEN HOUSE
Sunday April 14th 12-1:30 PM

### 3 Gramercy Park West, Apt. 2

Direct Gramercy Park Views
Key to Gramercy Park
Townhouse Living



---

Click here to view the listing.

Rare opportunity to own an elegant three bedroom home facing the only private park in Manhattan. Perched on the second floor of an 1840s Greek Revival red brick townhouse embellished by cast iron lacework, the grand living room has three large windows with direct views of Gramercy Park. The expansive living space has distinct areas for living and dining, an ideal room to relax and take in perfectly centered east to west views of the Park with its ever-changing seasonality, colors, and light.






The spacious layout offers excellent flow; a hallway with an ornate arched ceiling leads to the separate bedroom wing. Both bedrooms have easy access to the bath, one with the bath en suite. One of the bedrooms would make for a great home office. The master bedroom is a truly private and impressionable space with two oversized windows offering views of the Calvary- St. George's Church, ivy, as well as garden greenery. Details such as the unique octagonal shape of the room, mosaic hardwood

ODC001646

floors, moldings, and original shutters are sure to impress even the most discerning buyer.



For more information please contact
Paul at PTK@corcoran.com or 212-500-7026



Shown exclusively through:
Sara Gelbard | Paul Kolbusz | Melissa Sargeantson
Licensed Associate RE Brokers
212.500.7026 office
SG@corcoran.com | PTK@corcoran.com | MHS@corcoran.com

Copyright © 2019 The Gelbard-Kolbusz Team at The Corcoran Group, All rights reserved.

ODC001647

This email was sent to ptk@corcoran.com

*why did I get this?*   unsubscribe from this list   update subscription preferences

Melissa Sargeantson · 30 Irving Pl Fl 5 · New York, NY 10003-2303 · USA

*Wire Fraud is Real*.  Before wiring any money, call the intended recipient at a number you know is valid to confirm the instructions. Additionally, please note that the sender does not have authority to bind a party to a real estate contract via written or verbal communication.

ODC001648



Olympia De Castro <olympia.decastro@gmail.com>

---

## FW: 314 Hicks

**Gustavo Hernandez** <ghernandez@gsadvisors.net>                    Mon, May 18, 2020 at 3:59 PM
To: Olympia De Castro <olympia.decastro@gmail.com>

Punch list attached.
It includes all pending items of the inspection report.

Begin forwarded message:
From: Jill Levy Reiter <mailto:Jill@jlevyreiteresq.com>
Date: May 18, 2020 at 11:02:28 AM EDT
To: Olympia De Castro <mailto:olympia.decastro@gmail.com>
Subject: RE: 314 Hicks

Good morning and thank you for your kind words. Even though I am sitting Shiva for my mother this week, I did want to respond to you so please see below...IN CAPS...

=====================================================================
***PLEASE NOTE NEW EMAIL ADDRESS- mailto:jill@jlevyreiteresq.com
=====================================================================
Jill Levy Reiter, Esq.
251 Fifth Avenue- 4th floor
New York, New York 10016
212-889-5300
Fax- 212-686-4489
mailto:jill@jlevyreiteresq.com
[Quoted text hidden]
On May 13, 2020, at 2:33 PM, Jill Levy Reiter <mailto:Jill@jlevyreiteresq.com> wrote:

Hello...For your careful review, I attach the Seller's red lined changes and clean copies of the Contract, Riders and punch list (which states the status of each item and will be revised for the final draft to just state that the seller will repair the item, prior to closing.)

In addition, the Seller said :

• The AV system was installed by and is managed by Soundsight Technologies.
• The Security System is Alarms R US
• HVAC system contract is with ALL HVAC, seller paid the contract through 10/31/2020 ($1,360.94) and will give that to Purchaser, without adjustment. Purchaser needs to take over the account post closing.
• Landscaper is Project Plant.

Further points:

• The HVAC system was serviced on May 11.
• The elevator violations refer to the dumbwaiter and they want to give you a credit instead of clearing them because inspections from the city will be required and no one knows when those will resume. Per DOB they are just failures to file 2 Cat 1 inspection/tests and such have to be filed by the elevator company. The seller will give you the name and contact for the company.so you could coordinate directly with them. She said it will cost $1,000.00 each and is willing to give you a credit of $3,000.00. Can your Contractor or architect confirm that cost? We can always try to ask for a larger credit, too if you want.
• The carpet runners on the stairs are remaining and they were recently steam cleaned.
• Please confirm you are not assigning to an LLC because if you are, we have to include language.
• They cannot accept now for the down payment so you will have to be able to arrange a wire.

FYI - my mother passed away this morning so my response may be delayed in the next day or so. Thank you for your understanding.

GOVERNMENT EXHIBIT 27

ODC001657

**EXHIBIT E**

```
================================================================================
```
\*\*\*PLEASE NOTE NEW EMAIL ADDRESS- mailto:jill@jlevyreiteresq.com
```
================================================================================
```
Jill Levy Reiter, Esq.
251 Fifth Avenue- 4th floor
New York, New York 10016
212-889-5300
Fax- 212-686-4489
mailto:jill@jlevyreiteresq.com
[Quoted text hidden]

---

NYDOCS1-#1126778-v1-314_Hicks_Street_punch_K_2_.DOCX
693K

ODC001658

 Gmail

Olympia De Castro <olympia.decastro@gmail.com>

---

## Fwd: 314 Hicks Street - HVAC Maintenance Proposal

**Olympia De Castro** <olympia.decastro@gmail.com>                                    Tue, Jul 14, 2020 at 6:28 PM
To: Gustavo Hernandez <ghernandez@gsadvisors.net>

I wonder if Bret would have a better alternative or if this service is even necessary.

---------- Forwarded message ---------
From: **314hicks llc** <314hicksllc@gmail.com>
Date: Tue, Jul 14, 2020 at 6:27 PM
Subject: Fwd: 314 Hicks Street - HVAC Maintenance Proposal
To: <olympia.decastro@gmail.com>


---------- Forwarded message ---------
From: **Nancy Carrero** <nancy@allhvac.com>
Date: Fri, Jul 10, 2020 at 3:15 PM
Subject: 314 Hicks Street - HVAC Maintenance Proposal
To: 314hicksllc@gmail.com <314hicksllc@gmail.com>
Cc: Contracts <contracts@allhvac.com>


Good afternoon Olympia,


It was a pleasure speaking with you today.

Attached is the HVAC maintenance contract for the above location.

If you would like to move forward with the contract proposal, please sign and either e-mail or fax back to
(718) 718) 921-6236.


Thank you and have a great day!


Nancy Carrero


Nancy Carrero

Client Service Relationship Manager

All HVAC Service Co., Inc.

9030 Ft. Hamilton Pkwy.

Brooklyn, NY  11209

718-833-0148

GOVERNMENT
EXHIBIT
28

ODC001685

**EXHIBIT E**

Fax 718-921-6236

**nancy@allhvac.com**

Need to upgrade to LED lights?  Save money with Con Ed's Instant Lighting Incentive Program.  Bright Energy Services, a division of All HVAC, is a Con Edison Participating Contractor, and is authorized to sell eligible Con Ed customers LED lights at deep discounts. Learn more and place your order here today: https://savings.brightenergyservices.com/instant-rebate-eligible-products

--
_____
Olympia A. De Castro
M 917 [redacted]
olympia.decastro@gmail.com

_____

📄 **314 Hicks LLC.pdf**
   210K

ODC001686

 Gmail

Olympia De Castro <olympia.decastro@gmail.com>

---

## TIME SENSITIVE: Gift filing and invoice review

**Olympia De Castro** <olympia.decastro@gmail.com>
To: Gustavo Hernandez <ghernandez@gsadvisors.net>

Wed, Jul 15, 2020 at 4:23 PM

Can you please find me a new accountant.

---------- Forwarded message ---------
From: **Frank Jr. Rosillo** <Frankjr@rosillocpa.com>
Date: Wed, Jul 15, 2020 at 4:19 PM
Subject: RE: TIME SENSITIVE: Gift filing and invoice review
To: Olympia De Castro <olympia.decastro@gmail.com>
Cc: Diana Dos Santos <DSantos@rosillocpa.com>

Olympia –

We have discussed old balances several times now, what are you still unsure about?

We are not doing anymore work for you until we get this resolved and retainers to start new work.

Best Regards,

Frank Rosillo, CPA, MST

Rosillo & Associates, P.A. | 305-477-5671 | Fax: 305-477-2640

7950 N.W. 53 Street - Suite 221, Doral, Florida 33166

frankjr@rosillocpa.com | www.rosillocpa.com

Corporate & Personal Tax Returns | Domestic & International | Tax Planning Strategies | Tax Audits & Collections | Sales Tax Declaraciones de impuestos Corporativos & Personal | Domestico e Internacionales | Planificaciones Financieras | Auditorias | Impuestos Sobre Ventas

 ROSILLO & ASSOCIATES



Map - Doral Office (Main)

Visit our website at www.rosillocpa.com to upload/download your accounting data, view the tax news, get helpful business sucess tips, and much more...

*U.S. Treasury Circular 230 Notice: Any tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, for the purpose of (a) avoiding penalties that may be imposed under the Internal Revenue Code or by any other applicable tax authority; or (b) promoting, marketing or recommending to another party any tax-related matter addressed herein. We provide this*

ODC001978

**EXHIBIT E**

*disclosure on all outbound e-mails to assure compliance with new standards of professional practice, pursuant to which certain tax advice must satisfy requirements as to form and substance.*

*This electronic mail transmission may contain confidential or privileged information. If you believe you have received this message in error, please notify the sender by reply transmission and delete the message without copying or disclosing it.*

**From:** Olympia De Castro
**Sent:** Wednesday, July 15, 2020 4:12 PM
**To:** Frank Jr. Rosillo
**Cc:** Diana Dos Santos
**Subject:** Re: TIME SENSITIVE: Gift filing and invoice review

Frank-

Re. the old invoice- I am waiting your response clarifying what work the invoice is pertaining. As soon as I understand that I will make payment.

Re. DC trust, I am not requesting you file the return. What I understand is you need to file today a notice with the IRS that the trust has received a gift. This was raised to me by the trust attorney. Is that not the case? I raised this question last week.

On Jul 15, 2020, at 4:08 PM, Frank Jr. Rosillo <Frankjr@rosillocpa.com> wrote:

Hi Olympia –

We have never received payment on the outstanding balances we have for you, nearly a year old now.

Additionally, we have not received a retainer from you for DC Irrevocable Trust with enough time to complete the return you are requesting for today.

Best Regards,

Frank Rosillo, CPA, MST

Rosillo & Associates, P.A. | 305-477-5671 | Fax: 305-477-2640

7950 N.W. 53 Street - Suite 221, Doral, Florida 33166

frankjr@rosillocpa.com | www.rosillocpa.com

ODC001979

Corporate & Personal Tax Returns | Domestic & International | Tax Planning Strategies | Tax Audits & Collections | Sales Tax

Declaraciones de impuestos Corporativos & Personal | Domestico e Internacionales | Planificaciones Financieras | Auditorias | Impuestos Sobre Ventas

<023909D6C1F847BB8175D3B9C9D7B321[2718687].png>

Map - Doral Office (Main)

Visit our website at www.rosillocpa.com to upload/download your accounting data, view the tax news, get helpful business sucess tips, and much more...

*U.S. Treasury Circular 230 Notice: Any tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, for the purpose of (a) avoiding penalties that may be imposed under the Internal Revenue Code or by any other applicable tax authority; or (b) promoting, marketing or recommending to another party any tax-related matter addressed herein. We provide this disclosure on all outbound e-mails to assure compliance with new standards of professional practice, pursuant to which certain tax advice must satisfy requirements as to form and substance.*

*This electronic mail transmission may contain confidential or privileged information. If you believe you have received this message in error, please notify the sender by reply transmission and delete the message without copying or disclosing it.*

---

**From:** Olympia De Castro
**Sent:** Wednesday, July 15, 2020 3:46 PM
**To:** Frank Jr. Rosillo; Diana Dos Santos
**Subject:** Re: TIME SENSITIVE: Gift filing and invoice review

Frank,

Just spoke to Diana.

I am happy to pay a 50% deposit on the DC Trust filing so you guys can file with the IRS the gift declaration that is due today. Please let me know if you agree that the $300 would be the all inclusive cost of the DC Trust filing.

Like I said, I will provide the balance sheet for 2019. The only cash movement of this entity is 2 gifts of cash that need to be declared today, and interest income from one account. That's it.

Please let me know if that makes sense and if you can make the gift filing today for this entity.

We can discuss the other items on a later date when we are all less busy.

Thanks, Olympia

ODC001980

**EXHIBIT E**

On Tue, Jul 14, 2020 at 9:10 AM Olympia De Castro <olympia.decastro@gmail.com> wrote:

> Frank -
>
> Diana and I went through these invoices yesterday evening. I have outlined below my comments. Please address these at your convenience.
>
> Please confirm asap this will not hold up the filing of the gift to the DC trust today / tomorrow - as this would create an issue per the trust attorney and I will have to consider alternatives for tax services.
>
> In short.
>
> **Invoice 28847 -** 314 Hicks LLC :: $325
>
> This invoice is out of place. We agreed I would do the NY state filing and this entity was sent to you with an EIN that was filed by the registered agent. Please clarify what work the Rosillo team has done here.
>
> **Invoice: 27833** - estimate for ODC 2019 taxes :: estimate $700
>
> **comment:** I am ok with $700 if it is inclusive of all.
>
> A few items to clarify:
>
> 1) What does schedule D stock proceeds pertain to?
>
> 2) Why do you believe home office expenses would not be applicable?
>
> I will have similar CIM filings as I was still receiving income from CIM. I understand this is an estimate and am ok with +/- $100 differential. Please confirm that will be the case and I will make 50% deposit.
>
> I have attached **Invoice 27457** as a reference of 2018 taxes to help you remember the work from last year.
>
> **Invoice 28878:** estimate for DC Trust 2019 filing :: **estimate $300**
>
> **comment:** this seems excessive for a very simple filing that only has two gifts of cash and monies sitting in a money market account. I was concerned you did not raise the need to file the gift tax this year as we have discussed the trust set up extensively.
>
> I am ok with this provided it is all in, inclusive of the gift filing due tomorrow + the extension filing, which I believe is mistakenly included in the next invoice below.
>
> **Statement 1:** past invoices. **$550.**
>
> POA: $250. I paid for as reflected in the statement
>
> **Invoice 28109:** amount $450 - please clarify what work was done here related to 2013 - 2015 filings
>
> **Invoice 28603:** amount $100 - Please clarify. I understand this is the extension for DC Trust? If so please apply it to DC Invoice per above and remove from here.

ODC001981

**EXHIBIT E**

That would mean you have not charged me for filing my extension. Has this been done. You can include it in the 27833 invoice that pertains to ODC.


Thanks, Olympia


--

Olympia A. De Castro
M 917

olympia.decastro@gmail.com


--

Olympia A. De Castro
M 917

olympia.decastro@gmail.com


<20200715144854.pdf>


--

Olympia A. De Castro
M 917
olympia.decastro@gmail.com

ODC001982

EXHIBIT E



EXHIBIT E

 Gmail

Olympia De Castro <olympia.decastro@gmail.com>

---

## Re: bond hearing

Olympia De Castro <olympia.decastro@gmail.com>                    Thu, May 16, 2019 at 8:39 PM
To: "Pasano, Michael S." <mpasano@carltonfields.com>
Cc: "jcgomez06@gmail.com" <jcgomez06@gmail.com>, "Chee, David W.A." <DChee@carltonfields.com>, "Curtis, Ben
(Bcurtis@mwe.com)" <Bcurtis@mwe.com>

Michael-

I am not inclined to co-sign anything. Do not offer it as an option.

NY property is impossible to put up. I have repeatedly said this. I don't understand why this is in the conversation. Why it
was represented to the government that we could even put this up.

I will file for divorce next week regardless of what happens tomorrow. As a single mother provider for three children - and
under the circumstances- a divorce does not feel premature to me.

As Gustavo's attorney with the responsibility of working to get him released tomorrow, you should consider an offer that
would be achievable to deliver on. Given the urgency around this to your client, I can accommodate to meet with you
tonight or tomorrow morning as early as 7a so you have more time to prepare a feasible offer and have a chance to
discuss it with Nadler before the bond hearing to avoid a contested bond hearing. It is not in Gustavo's interest for you to
offer a package that is not possible to obtain.

I can commit to keep the kids here during this process and you can use that to build Gustavo's bond hearing. But I will not
put up my passport nor co-sign anything.


> On May 16, 2019, at 7:20 PM, Pasano, Michael S. <mpasano@carltonfields.com> wrote:
>
> If you are wanting Gustavo to stay in jail, consult with whomever you deem necessary. I am sorry if that sounds harsh.
> We represent Gustavo. I hope that you and the family will do everything possible tomorrow to see Gustavo released.
> I cannot speak to divorce issues.
> Nor should I.
> It all feels premature to me, but I say that as Gustavo's lawyer wanting him released and living at the Miami home.
> I will be at the Courthouse by 9:30 am. Am happy to meet there and then.
> I believe a bond agreement is happening.
> It will require signatures on a personal bond. It will likely require $50,000 paid into the Court registry to secure a 10 per
cent $500,000 cash bond.
> We will find out what else if anything is necessary at court tomorrow.
> Msp
>
> -------- Original Message --------
> From: Olympia De Castro <olympia.decastro@gmail.com>
> Date: Thu, May 16, 2019, 7:11 PM
> To: "Pasano, Michael S." <mpasano@carltonfields.com>
> CC: Juan C Gomez <jcgomez06@gmail.com>, "Chee, David W.A." <DChee@carltonfields.com>, "Curtis, Ben
(Bcurtis@mwe.com)" <Bcurtis@mwe.com>
> Subject: Re: We need to show Government the trust documents for NY property
>
> Michael,
>
> Would like to recap where we stand for tomorrow. In light of the fact we have no agreement yet - and there seems to be
a confusion about Ny- I think it would make sense for us to meet in person either tonight or tomorrow first thing.
>
> 1- NY: it I NOT possible to pledge that property. As I have reiterated in the past- we do not control it. It is in an
irrevocable trust of which neither Gustavo nor I are trustees.
>
> 2- Miami: I am uncertain if I even want to co-sign for this. I will be filing for a divorce next week and want to consult with

ODC001909
GOVERNMENT
EXHIBIT
31

**EXHIBIT E**

my divorce lawyer if I should even do this.
>
> Similarly - any other item I would have to personally guarantee from my side - I would like to consult with my lawyer.
>
> I know Ben could be available to meet at my house at 10p assuming his flight gets in on time. You both are welcome to come over.
>
> Otherwise I can be available anytime tomorrow morning.
>
>> On May 16, 2019, at 5:56 PM, Pasano, Michael S. <mpasano@carltonfields.com> wrote:
>>
>> Great.
>>
>> -------- Original Message --------
>> From: Juan C Gomez <jcgomez06@gmail.com>
>> Date: Thu, May 16, 2019, 5:34 PM
>> To: "Pasano, Michael S." <mpasano@carltonfields.com>
>> CC: Olympia De Castro <olympia.decastro@gmail.com>, "Chee, David W.A." <DChee@carltonfields.com>, "Curtis, Ben (Bcurtis@mwe.com)" <Bcurtis@mwe.com>
>> Subject: Re: We need to show Government the trust documents for NY property
>>
>> Cesar agreed to co-sign. I didn't discuss with him pledging the house because I understood it was not necessary.
>>
>> JCG
>>
>>
>>
>>
>> El 16/05/2019, a la(s) 5:14 p. m., Pasano, Michael S. <mpasano@carltonfields.com<mailto:mpasano@carltonfields.com>> escribió:
>>
>> Just have this all ready.
>> As for the trust, the AUSA was asking if a trustee could also sign on the bond BUT not pledge any property.
>> M
>>
>> -------- Original Message --------
>> From: Olympia De Castro <olympia.decastro@gmail.com<mailto:olympia.decastro@gmail.com>>
>> Date: Thu, May 16, 2019, 5:11 PM
>> To: "Pasano, Michael S." <mpasano@carltonfields.com<mailto:mpasano@carltonfields.com>>
>> CC: jcgomez06@gmail.com<mailto:jcgomez06@gmail.com>, "Chee, David W.A." <DChee@carltonfields.com<mailto:DChee@carltonfields.com>>, "Curtis, Ben (Bcurtis@mwe.com<mailto:Bcurtis@mwe.com>)" <Bcurtis@mwe.com<mailto:Bcurtis@mwe.com>>
>> Subject: Re: We need to show Government the trust documents for NY property
>>
>> Michael-
>> As we discussed there are problems with using the Ny property as collateral or having the trust provide a personal guarantee
>> 1- the NY property can not be pledged under the coop doc.
>> 2- the trustee would be violating its fiduciary to pledge assets or personally guarantee whatsoever as it would not be considered in the best interest of beneficiaries.
>> Therefore the point is mute.
>>
>> But the good news is Cesar and Tulena are willing to pledge their house and waive the homestead exemption and that property is valuable and encumbrance free.
>>
>> We can also include the miami property.
>>
>> We have some friends that can get to 50k value. Potentially even 100k.
>>
>> I'm available to discuss in greater detail over phone.
>>
>> On May 16, 2019, at 3:29 PM, Pasano, Michael S. <mpasano@carltonfields.com<mailto:mpasano@carltonfields.com><mailto:mpasano@carltonfields.com>> wrote:
>>
>> Getting close.

ODC001910

—

>> They are inclined to ask that the Trust co-sign on the bond, but understand that the condo cannot be pledged. So they want to see the Trust documents.
>> They will want Cesar to co-sign a bond.
>> It seems they will not require a corporate bond. BUT a cash bond of $500,000, which means we will need to post $50,000 in cash.
>>
>> Please get to either me or David the Trust docs and confirm we can do all this.
>> David will be seeing Gustavo tonight.
>>
>> m
>>
>> <image003.png>
>> Michael S. Pasano
>> Attorney at Law
>>
>> Miami Tower
>> 100 S.E. Second St., Ste. 4200
>> Miami, Florida  33131-2113
>> Direct:  305.530.4064 | Fax:  305.530.0055
>>
>> mpasano@carltonfields.com<mailto:mpasano@carltonfields.com><mailto:mpasano@carltonfields.com> | www.carltonfields.com<http://www.carltonfields.com><http://www.carltonfields.com<http://www.carltonfields.com<http://www.carltonfields.com><http://www.carltonfields.com>>
>> bio<https://www.carltonfields.com/team/p/michael-s-pasano> |vcard<https://www.carltonfields.com/Libraries/CarltonFields/Media/Attorney%20Vcards/Michael-S-Pasano.vcf?ext=.vcf>
>>
>> Carlton Fields is ISO 27001:2013 certified.
>>
>> Confidential: This e-mail contains a communication protected by the attorney-client privilege or constitutes work product.  If you do not expect such a communication please delete this message without reading it or any attachment and then notify the sender of this inadvertent delivery.
>>
>

ODC001911

**EXHIBIT E**

DEVINE GOODMAN
& RASCO, LLP

Guy A. Rasco, Esq.
Tel: 305-374-8200 Ext. 20
E-mail: grasco@devinegoodman.com

2800 PONCE DE LEON BOULEVARD
SUITE 1400
CORAL GABLES, FLORIDA 33134

P 305.374.8200
F 305.374.8208
WWW.DEVINEGOODMAN.COM

December 27, 2019

**VIA EMAIL**
Olympia De Castro
c/o Gustavo Hernandez
ghernandez@gsadvisors.net

> Re:   Action to Recover $900,000 (1/3 share) from Sale of Investment in Wine Merchant
> from Daniel M. Holtz

Dear Ms. De Castro:

This is to confirm the retention of the law firm of Devine Goodman & Rasco LLP ("DGR") to represent you in connection with the above-referenced matter. The following terms will govern our representation of you.

1.     DGR will be responsible for the proper and diligent handling of the representation. I will be the attorney principally responsible for this matter.

2.     You agree to compensate us for our legal services based on an hourly fee arrangement. My reduced hourly rate is $450 for this matter only. Other of our professionals bill at lesser or greater rates. We will always seek the most efficient use of our professionals and staff to help manage costs. Hourly rates may be adjusted, but not more than once a year.

3.     Payment of all expenses in this representation is also your responsibility. Expenses include, but are not limited to, travel, investigative fees, expert fees, subpoena service expenses, witness fees, computerized legal research expenses, deposition transcripts, and photocopying charges, etc.

4.     It is the policy of this firm that all bills are due within twenty (20) days. This policy assists us in keeping our overhead down and permits us to serve our clients more efficiently. We make every effort to send you detailed statements every month, so that you are able to closely monitor fees and costs as they are incurred.

5.     To further assist in monitoring fees and costs, we do not undertake additional work on any account which is not current. If there are any questions with regard to a statement, please contact us in writing within fifteen days from the statement date, absent which the statement shall conclusively be deemed accurate and acceptable.

GOVERNMENT
EXHIBIT
32

Olympia De Castro
c/o Gustavo Hernandez
December 27, 2019
Page 2

6. You acknowledge that, although we will zealously expend our best efforts on your behalf, litigation is an uncertain process and you have received no promise or guarantee regarding the outcome of this matter, or of any part of it. You further acknowledge that the fees and costs owed to the Firm under this engagement are not contingent on any outcome, result or ruling of the court. Rather, legal fees are due and owing to the Firm once the work has been conducted on your behalf and a bill has been presented for your review. Notwithstanding this, you also recognize that the Firm is entitled to an equitable lien (including but not limited to a charging lien or retaining lien, as applicable) over any proceeds of this litigation, up to the amount of any then unpaid legal fees.

7. Should it become necessary to bring an action to collect our fees, you agree to pay for all costs of such action including attorneys' fees.

8. Our office requires a refundable retainer of $15,000 to undertake this matter. These funds will be held in trust and applied against both fees and costs for my firm, as incurred each month. You agree to replenish this retainer as requested to insure legal bills can be paid promptly. If any portion of the retainer is unused at the conclusion of our representation, it will be refunded to you. We reserve the right to seek additional retainers as necessary, including *inter alia* if this matter should go to trial. Our obligation to commence representation will not begin unless and until we receive the following: (1) an executed copy of this retainer letter; and (2) the initial retainer amount. You may send the retainer by check or via wire transfer. Our wire transfer details are attached.

8. The foregoing has been explained and is fully understood by the parties. No promises or representations have been made as to the outcome of this matter. Please carefully review the above confirmation of our agreement. If you have any questions please call. Otherwise, please sign below and return one copy to our office. We very much look forward to working with you and Gustavo on this case.

Very truly yours,

Guy A. Rasco

GAR:vtb
Enclosure

## ACCEPTANCE OF TERMS SET FORTH ABOVE

Olympia De Castro

Date: 12/28/2019



# Bank of America NA
# IW Account - Wire instructions

**701 Brickell Ave
Ste 1500-A
Miami, FL 33131
Ph: 888-400-9009
Fax: 800-678-1261**

| | |
|---|---|
| **Bank Contact:** | **Mary L. McInnis** |
| **Bank Name:** | **Bank of America** |
| **ABA Number:** | **026009593** |
| **Account Number:** | ▉432 |
| **Swift Number:** | **BOFAUS3N** |
| **Account Name:
Beneficiary:** | **Devine Goodman & Rasco, LLP** |

**Updated 3.21.19 – By: KV**